UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

18 JUL ˉ9  AM 10: 49

| | |
|---|---|
| Rebecca Gallogly, | § |
| | § |
| Plaintiff, | § |
| | § |
| v. | § |
| | § |
| The United States of America | § |
| U.S. Attorney's Office, | § |
|     Western District of Texas - Austin | § |
| The U.S. Department of Housing and | § |
|     Urban Development | § |
| The Environmental Protection Agency | § |
| The State of Texas | § |
| Travis County Criminal Court | § |
| Travis County District Attorney's Office | § |
| The City of Austin | § |
| Capital Area Private Defender Service | § |
| 2013 Travis Heights LP | § |
| Eureka Multifamily Group | § |
| Dominium Apartments | § |
| Michael Burke, Attorney | § |
| | § |
| Defendants. | § |

**A18CV0571 RP**

CASE NUMBER: _____

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff Rebecca Gallogly (hereinafter "Plaintiff"), filed this her Initial and Original

Complaint and respectfully shows the Court the following:

### I. INTRODUCTION

*General Facts*

1.      Herein is a constitutional rights action brought pursuant to 42 U.S.C. § 1331,

involving a perfect storm of pervasive and severe continuing violation of many of Plaintiff's

rights involving  court proceedings surrounding her previous arrest, as well as her initial

occupancy at and continued tenancy on the premises of Lucero Apartments, located at 2301 Durwood Street, Austin, TX, 78704.

2.      These seemingly disparate issues are related in that Plaintiff's ineffective assistance of counsel and violation of her right to speedy trial coincided in time with and directly impacted her initial occupancy process at Lucero Apartments, during which Plaintiff was deprived of her Fifth Amendment right to due process for maintaining public housing occupancy eligibility based on an open arrest charge — a violation that continues to adversely infringe upon Plaintiff's liberty.

3.      Lucero Apartments is a multifamily housing complex near Downtown Austin, TX consisting of 173 units, newly built in 2015. There, multiple HUD financial assistance programs are administered for low-income residents in the leasing office.

4.      The owner of Lucero Apartments is 2013 Travis Heights LP, hereafter, "Property Owner".

5.      Plaintiff submitted an application for occupancy and financial assistance in late 2015 or early 2016. At that time, Eureka Multifamily Group (hereafter, "Eureka Multifamily") managed Lucero Apartments property as well as the provision of HUD financial assistance to residents living there. Eureka Multifamily continued to manage the property until Dominium Apartments took over management on or around August 2017.

6.      In July 2016, Plaintiff was told by Eureka Multifamily that she had unit available to her. When Plaintiff mentioned in passing she was working diligently to resolve an open criminal trespass charge, Eureka Multifamily suspended her occupancy based on the charge, and provided Plaintiff a one-week extension to resolve her charge.

7.      Plaintiff's court appearance date for resolving the charge was July 20, 2016. Plaintiff's deadline from Eureka Multifamily to regain eligibility for her subsidized unit was July 22, 2016.

8.      During Plaintiff's court appearance, on July 20, 2016, Plaintiff stated she wished to go to trial. Plaintiff's attorney, Michael Burke, court-appointed by way of Capital Area Private Defender Service, said Plaintiff would not have time to go to trial and resolve the case to meet Eureka Multifamily's July 22, 2016 deadline due to the time-consuming nature of holding a trial.

9.      Plaintiff stated on record to the Criminal Travis County Court judge that she felt coerced into plea bargain. Travis County Court failed to take any action to relieve Plaintiff of her expressed coercion, thereby depriving Plaintiff of her Fifth Amendment right to due process.

10.      Thus, Plaintiff was coerced into a plea bargain involving Community Supervision, the presence of which on her record has and continues to violate Plaintiff's work liberties. The State of Texas is in part culpable for this problem due to insufficient expunction code.

11.      Plaintiff wrote her own motion for early termination of her Community Supervision, which was granted. Plaintiff provided copious amounts of evidence showing her innocence. With all of this information in hand, the Travis County District Attorney's Office continued their stance on continuing to deprive Plaintiff from her freedom of movement and association by maintaining their bar on her going to the campus of The University of Texas at Austin, as well as maintaining the email blockade The University imposed on Plaintiff's email address.

12.      Plaintiff has experienced deprivation of her right to domestic tranquility and general welfare the entire time she has resided at Lucero Apartments, due to myriad factors explicated in this complaint. Both property managers — Eureka Multifamily and Dominium Apartments —

are culpable in permitting Plaintiff's rights deprivations, with The City of Austin and The Environmental Protection Agency in part culpable.

13.    Plaintiff continues to experience myriad rights deprivations based on the numerous failures of her court proceedings for her criminal trespass charge, the rights deprivations incurred from Eureka Multifamily when initially taking up occupancy at Lucero Apartments, and ongoing rights deprivations occurring on the premises permitted by both Dominium Apartments and insufficient legislation promulgated by The Department of Housing and Urban Development, which are ongoing.

14.    To avoid confusion with the Lucero Apartments property name with the Dominium Apartments leasing management company name in this complaint, Dominium Apartments will be referred to as "Dominium Management" hereafter.

### *Plaintiff's Rights Deprivations*

15.    This complaint includes repeated violations of Plaintiff's universal rights by Defendants, by way of United Nations doctrine. Specifically, Defendants violated Plaintiff's universal right to work and free choice of employment, as well as protection from unemployment, by virtue of Article 23 in *The Universal Declaration of Human Rights* promulgated by the United Nations. Defendants also severely and repeatedly violated Plaintiff's universal right to freedom from degrading treatment, as declared in Article 5 of the same United Nations doctrine., as well as all of Plaintiff's universal rights that are duplicative and overlapping with those constitutional rights listed below.

16.    This complaint includes multiple violations by Defendants of Plaintiff's rights bestowed on her by the Constitution of the United States of America. Defendants violated and continue to violate Plaintiff's constitutional right to domestic tranquility and general welfare by

failing to protect her physical safety (including psychological / neurological), failing to ensure her quiet enjoyment of the property, and failing to ensure the security of her possessions on the premises beyond her apartment, among others. Defendants also violated Plaintiff's constitutional right to freedom of movement by way of preventing Plaintiff's physical presence on The University of Texas at Austin Campus; by illegally and proactively ensuring her continuing poverty, which results in her persistent lack of a car; by virtue of capriciously enforcing overly restrictive movement of residents to enter and exit Lucero Apartments grounds; and by neglecting to secure freedom of movement across the internet via high-speed access in her impoverished state. Defendant is also deprived of her freedom of association with her colleagues, and more generally due to her overwhelming poverty and lack of comprehensive transportation.

17.    This complaint includes multiple violations by Defendants, of Plaintiff's rights bestowed her under various amendments to the Constitution of the United states of America. Specifically, Defendants violated Plaintiff's Sixth Amendment rights to speedy trial, notice of accusation, confrontation, effective assistance of counsel, and her right to a jury trial. Defendants also deprived Plaintiff of her Fifth Amendment right to lack of property deprivation without due process of law; her Fifth Amendment right to liberty by virtue of the end of sentencing; her Fifth Amendment right to due process; and her Fourteenth Amendment right to equal protection under the law related to housing access, hire for employment, and others.

18.    This complaint includes Defendants' violation of Plaintiff's rights bestowed her by the United states of America in the realm of federal rule of law and regulation, including her right to freedom from overwhelming paperwork burden by virtue of 5 CFR Part 1320, *Controlling Paperwork Burdens on the Public*, specifically proscribed by the U.S. Department of Housing and Urban Development (hereafter, "HUD") and as mandated rule for "Information

Collection Activities" affecting individuals and businesses; as well as violation of rules for assessing, and provision of unreasonable and unclear rules for administering, annual recertification as proscribed by *HUD Handbook 4350.3: Occupancy Requirements of Subsidized Multifamily Housing Programs*.

19.    Included in this complaint are Texas Penal Code Abuse of Office violations with respect to Plaintiff by way of Defendants acting as public servant designees for implementing HUD regulation. Violations involve Abuse of Official Capacity pursuant to § 39.02, and Official Oppression by way of § 39.03.

20.    This complaint includes multiple violations of Plaintiff's rights under Texas Property Code by Defendants, including Plaintiff's right to summon police or emergency assistance, pursuant to § 92.015; and, multiple violations of Plaintiff's right to freedom from retaliation from her landlord for asserting her rights, pursuant to § 92.331.

21.    All the violations listed herein have far-reaching, multiplicative, and enduring effects in the realm of synonymous rights violations, as well as equal protection for impoverished and therefore vulnerable residents based on both socio-economic status as well as race and sex, given the demographics of residents receiving federal housing subsidies.

## II. PARTIES

22.   Plaintiff Rebecca H. Gallogly,  2301 Durwood Street, Suite 3408, Austin, TX 78704

23.   Defendant Attorney General of the United States, U.S. Department of Justice, 950
        Pennsylvania  Avenue, NW Washington, DC 20530-0001

24.   Defendant U.S. Attorney's Office, Western District of Texas - Austin, TX, 816 Congress
        Avenue Suite 1000, Austin, TX 78701

25.   Defendant The U.S. Department of Housing and Urban Development, Chief Legal

Officer, General Counsel and Corporate Secretary, 451 7th Street S.W., Washington, DC

20410

26.   Defendant The Environmental Protection Agency, Office of the Administrator, 1200

Pennsylvania Avenue, N.W., Mailcode 1101A, Washington, DC 20460

27.   Defendant Environmental Protection Agency, Solid Waste and Emergency Response Law

Office Organization, 1200 Pennsylvania Avenue, N.W., Mailcode 2310A, Washington,

DC 20460

28.   Defendant The State of Texas, Citations Unit, Secretary of State, P.O. Box 12079, Austin,

TX 78711-2079

29.   Defendant Travis County Criminal Court, Blackwell-Thurman Criminal Justice Center

509 West 11th Street, 8th Floor, Austin, TX 78701

30.   Defendant Travis County District Attorney's Office, 509 West 11th Street, Austin, TX

78701

31.   Defendant The City of Austin, c/o Lee Crawford, General Counsel Division Chief, 301

W. 2nd Street, Austin, TX 78701

32.   Defendant Capital Area Private Defender Service, 816 Congress Avenue, #700, Austin,

TX 78701

33.   Defendant 2013 Travis Heights LP, Lucero Apartments Owner, 920 S Main Street

Suite 200, Grapevine, TX 76051-7517

34.   Defendant Eureka Multifamily Group, 920 S Main Street, Grapevine, TX 76051

35.  Defendant Dominium Apartments, 2905 Northwest Boulevard, Suite 150, Plymouth, MN 55441-2644

36.  Defendant Attorney Michael Burke, 1214 E 7th Street, Austin, TX 78702

### III. JURISDICTION AND VENUE

37.  The Court has jurisdiction over this lawsuit pursuant to 28 U.S.C § 1331, as this lawsuit arises under the Constitution, laws, or treaties of the United States of America, as thoroughly delineated in the introductory paragraph above, under the heading "Plaintiff's Rights Deprivations".

38.  The venue in this judicial district and division is proper by virtue of 5 U.S.C. § 703 and 28 U.S.C. § 1391(e)(1) because Plaintiff resided in Austin at the time of occurrence of the factual allegations, and continues to do so. The venue is also proper under 16 U.S.C. § 1540(g)(3)(A) because the violations occurred in this district.

### IV. SUMMARY OF FACTUAL ALLEGATIONS

### COURT-RELATED DEFENDANTS VIOLATED PLAINTIFF'S FIFTH AND SIXTH AMENDMENT RIGHTS AND MADE A MOCKERY OF THE JUDICIAL PROCESS

39.  Plaintiff was illegally arrested for Criminal Trespass at The University of Texas at Austin on August 4, 2015 (see the file for Cause #C-1-CR-15-211649 on file with Travis County Criminal Court in Austin, TX) while peaceably seeking an appointment with the Office of the President to redress her civil rights complaint and engage in the legitimate business of advocating for placement of a postdoctoral office administrated in a manner that would meet standards preferred by The University of Texas System. Plaintiff reported this illegal arrest to the Federal Bureau of Investigation (FBI) as a federal crime under color of law.

40.     Due to Plaintiff's indigence, the Capital Area Private Defenders (CAPDS) Office facilitated the court appointment of attorney Michael Burke to represent her. Plaintiff communicated to Mr. Burke that she reported her illegal arrest to the FBI.

41.     Beginning early in court proceedings and throughout the course of them, Plaintiff provided Mr. Burke evidence of her innocence.

42.     Early in pretrial court proceedings, Mr. Burke told Plaintiff he filed a motion to suppress evidence early in pretrial proceedings, which was resoundingly to the complete detriment of Plaintiff's case.

43.     Mr. Burke and Travis County District Attorney's Office issued empty continuances approximately once a month for almost a year, claiming he was waiting for prosecution to produce evidence in support of the justification of Plaintiff's arrest. It is unclear to Plaintiff how prosecution can produce evidence with a granted motion to suppress evidence.

44.     Mr. Burke failed to use the most basic argument for Plaintiff's case upon her explicit request — i.e., that she was engaged both in the federally protected act of seeking redress for her sex discrimination complaint, and in the legitimate business of advocating for a Office of Postdoctoral Affairs. "Legitimate business" is explicitly stated as a defense to prosecution for Criminal Trespass under Texas Penal Code.

45.     Mr. Burke stated he was a criminal and not a civil attorney, therefore, he did not have the expertise to use a civil argument in defense of a criminal charge.

46.     Mr. Burke and CAPDS staff failed to assist Plaintiff during a hearing for a Pretrial Motion to Dismiss she herself filed. Specifically, because Plaintiff was semi-homeless, carless, and impoverished, and therefore had restricted movement with time limitations and no money to print documents, Plaintiff asked CAPSD staff and Mr. Burke to bring the evidence she had sent

them in support of her Pretrial Motion to Dismiss, to the hearing. All of these individuals failed to bring said evidence. Plaintiff's Pretrial Motion to Dismiss was denied due to lack of evidence at the hearing.

47.    The Judge for Travis County Criminal Court gave Plaintiff no leniency for her pro se Pretrial Motion to Dismiss, acting curtly and with an air of haughty and spiteful righteous indignation in denying Plaintiff's motion, and not providing Plaintiff the opportunity to provide evidence during a subsequent hearing, despite the fact that Plaintiff indicated she had all the evidence available with her on her laptop in the courtroom, in the form of electronic files.

48.    CAPDS staff attempted to arrange a competency evaluation with Plaintiff during the time when she was to be menstruating. Plaintiff notified CAPDS she would be menstruating on the date the competency evaluation was held, had a reliable history of hormonal migraines during that time in her cycle, did not possess a car and therefore had concerns about being capable of bicycling to the competency evaluation appointment with a migraine, and wished to have the evaluation performed on a different date. CAPDS and the evaluating psychologist they appointed did not change the date of the evaluation (see **Attachment 1**).

49.    Menstruation by medical standards is shown to involve emotional lability and changes in brain function. It is, physiologically speaking, a condition of hormonal withdrawal. Therefore, CAPDS set up Plaintiff to potentially have an invalid, unreliable competency evaluation.

50.    CAPDS and their appointed evaluating psychologist conducted a rigorous, two-day psychological evaluation with long interviews and multiple questionnaires at or exceeding approximately 400 questions, most of it lacking in relevance for assessment of competency. For example, Plaintiff was administered the Minnesota Multiphasic Personality Inventory.

51.     Plaintiff experienced pervasive degrading treatment and emotional anguish by CAPDS during and surrounding her competency evaluation. For example, a member of CAPDS and their assigned evaluating psychologist together bullied Plaintiff during the evaluation, asserting she had no case and completely fallaciously suggesting she left a "trail of destruction in her wake (paraphrasing)" generally throughout her life, inferring Plaintiff was a psychopath. Plaintiff avers all the people with whom she was or is involved are doing fine, whereas Plaintiff's life is in ruins — giving zero credence to the "trail of destruction" comment.

52.     The evaluating psychologist appointed by CAPDS made the terms of the evaluation unclear with respect to whether he had the legal authority to diagnose, or would diagnose her. Evaluating psychologist subsequently issued a fallacious and incoherent evaluation riddled with lies, and with defaming suggestions about diagnoses having no direct bearing on competency, and which he was unable to substantiate given the duration of the evaluation. Indeed, despite all the unsubstantiated and therefore degrading suggestions about her mental health, the evaluating psychologist evaluated Plaintiff as competent.

53.     Mr. Burke failed to use copious amounts of evidence provided to him throughout the course of legal proceedings in defense of Plaintiff for her criminal trespass charge, some which was used successfully by Plaintiff in her subsequent motion for early termination of court supervision (see **Attachment 2**).

54.     The Judge of Travis County Criminal Court failed to notice that pretrial court proceedings violated speediness for some time. Plaintiff's arrest occurred on August 4, 2015, yet the case was not resolved until July 20, 2016. The Judge of Travis County Court avered that the right to speed refers to only the trial itself, and not to any pretrial proceedings. Given that this

means a misdemeanor charge could be open for ten years due to pretrial conferencing, this argument does not pass the laugh test.

55.     Said violation of Plaintiff's right to speedy trial ultimately led to adverse effects in which Plaintiff was coerced into plea bargain, which Plaintiff stated on record.

56.     After Plaintiff submitted overwhelming evidence showing her innocence for her criminal trespass case, the Travis County District Attorney's Office both refused to allow Plaintiff to go to campus, or to provide Plaintiff relief from the negative sequelae arising from the fallacious criminal trespass charge, which the Visiting Judge with Travis County Criminal Court permitted.

57.     CAPDS failed to name its organization in a way that reflects its function as service toward the indigent public, and rather denoting the types of lawyers they contract for counsel appointment, thereby giving an air of primacy and import to attorneys' needs and preferences, rather than those of the clients they are appointed to serve. That is, rather than calling the organization the "Capital Area Public Defender Service", it is coined the "Capital Area Private Defender Service".

**DEFENDANTS COMBINED ACTIONS CREATED EMPLOYMENT BARRIERS FOR PLAINTIFF**

58.     On July 5, 2016, Eureka Multifamily Group (hereafter, "Eureka Multifamily") was managing Lucero Apartments, and informed Plaintiff that a public housing unit had come available for her. Eureka Multifamily told Plaintiff at this time that she had approximately a week to claim the unit, before it then became unavailable to her.

59.     At that time, Plaintiff was indigent and on the verge of homelessness, having slept outside and lived in squalor, and experienced emotional abuse, bullying and torment at the tenuous places where she was able to temporarily seek shelter.

60.     Also at that time, Plaintiff had a social worker providing indigent services to her through The City of Austin. Plaintiff worked fervently and under great stress due to the limited time constraints provided by Eureka Multifamily, to engage her social worker in processing the paperwork for getting the first month's rent and deposit secured for her Lucero Apartments unit, through The City of Austin. At this same time still, Plaintiff started a new job, thinking work was necessary to claim the unit.

61.     During this week to secure the unit, Plaintiff informed Eureka Multifamily staff in passing that she needed to go to court to address her open criminal trespass charge — whereupon, Eureka Multifamily staff immediately stated to her that her unit was no longer available for her to take up residency because she had an open criminal charge. Eureka Multifamily stated that Plaintiff would therefore be required to resolve the open arrest record to regain occupancy eligibility of the unit Eureka Multifamily had set aside for Plaintiff.

62.     Eureka Multifamily provided Plaintiff The *Resident Selection Plan Layered Section 8 / LIHTC* manual bearing the Equal Housing Opportunity logo and, dated as revised in March 2015, contained a statement in support of this practice:

> If criminal screening indicates an unresolved criminal charge or an unresolved charge of an act covered under the Violence Against Women Act, the application will be suspended until the charge is resolved. At that time, the owner/agents current screening criteria will be applied.

63.     Eureka Multifamily staff stated Plaintiff had an extension of one week to close her criminal trespass misdemeanor case and that once the case was resolved Plaintiff may again become eligible to take up residency in the unit, with a deadline of July 22, 2016.

64.     Plaintiff "just so happened" to have a court date for said misdemeanor charge on July 20, 2016.

65.     During her July 20, 2016 court hearing, Plaintiff stated to The Court that she wished to go to trial. However, her lawyers advised her behind closed doors in a side conference room that trial would not be completed in time for her to have the case resolved for Eureka Multifamily's July 22, 2016 deadline to reopen her eligibility to take up occupancy in her public housing unit at Lucero Apartments.

66.     Therefore, Plaintiff signed a plea bargain with a probationary term, stating on record that she felt coerced into the plea bargain based on the timing relative to her housing eligibility. The Judge for Travis County Criminal Court did not ask for details surrounding Plaintiff's stated feeling of coercion, and attempted to make Plaintiff retract her coercion statement before she ruled. Plaintiff did not cooperate with the retraction, and the Judge ruled anyway.

67.     On and around July 21, 2017, Plaintiff engaged the application process for an entry-level job at Phoenix House, a residential drug treatment facility for teenagers a block north of Lucero Apartments. Given Plaintiff's educational background in psychology and her lack of transportation, Plaintiff was enthusiastic about having a job so close to home, to where she could walk in less than ten minutes.

68.     Plaintiff met with multiple Phoenix House staff multiple times, and had two interviews. Staff were enthusiastic about bringing Plaintiff on board, and Plaintiff was likewise enthusiastic about working for Phoenix House.

69.     Plaintiff engaged the hiring process, passing the drug test and all other criteria.

70.     Plaintiff was informed by phone and letter through Phoenix House's central Human Resources Department that Plaintiff was ineligible to work at Phoenix House based on her background check. Specifically, Phoenix House has a policy that forbids an employee from hire within two years of having served a probationary term, and as a health care / residential treatment facility franchise, Phoenix House has the legal right to implement such a policy.

71.     On September 1, 2017, Plaintiff, possessing a Ph.D. and decades of experience working in government, submitted an application for employment with Dominium Management for an Assistant Manager position at Lucero Apartments. Plaintiff was not hired. Instead, the staff that have persistently committed the legal violations outlined below in later sections, and who claim to have some experience in administering subsidized housing. were hired.

## PLAINTIFF EXPERIENCES A PERVASIVE AND CONTINUAL LACK OF DOMESTIC TRANQUILITY AT LUCERO APARTMENTS

72.     Plaintiff endured chronic and unrelenting psychological stress due to fear for her physical safety; noise; fear concerning the security and stability of her domicile, by way of fear of eviction; fear of homelessness due to financial duress, poor regulation and management; and harassing and degrading treatment from leasing office management staff since before she moved into Lucero Apartments in July 2016.

73.     Plaintiff has called Austin Police Department 311 or 911 more than 100 times — now approaching 150 times — since taking occupancy at Lucero Apartments on July 22, 2016 due to incidents at Lucero Apartments.

*Threatened Assault, Assault, Terroristic Threat, Persistent Harassment, Theft, and Other*
*Safety and Security Concerns*

74.      Shortly after Plaintiff took up residency at Lucero Apartments, the on-foot patrolman
— seemingly 24 hr because Plaintiff observed him talking congenially with a large group of kids
around the splash pad / recreation area more than once in the middle of the day — and who had a
demonstrated rapport with the children, left. It is Plaintiff's understanding he was replaced with
a car patrol service that only entered the garages, and did so only five times at random between
8p-5a.

75.      Thereafter, incidents of violence on the Lucero Apartments grounds skyrocketed.
Also, unrelenting noise suddenly became overwhelming with unsupervised children running
rampant being a main cause; it is a lease violation for children to go unsupervised on the
premises.

76.      In the late evening of September 23, 2016, Plaintiff heard extreme yelling involving
adults coming from about 50 yards away from her apartment, in the grassy recreation area.
Plaintiff went to the stairwell nearest her apartment where several other residents were gathered
to watch the incident below. Approximately twenty people were gathered in the area below
around the incident.

77.      During this altercation, two teenaged male kids engaged in a physical altercation with
a man who was reportedly their uncle, pushed him to the ground and kicked him in the head
multiple times. Plaintiff called 911 and asked a few on-lookers in her vicinity near the stairwell,
some of whom were neighbor acquaintances, if they could please serve as witnesses. They all
reported "I didn't see nothing," seemingly afraid to get involved.

78.     Incidents on October 1 and 2, 2016 that to Plaintiff's understanding were the precedent for the October 3 incident mentioned below, are written in an email provided as **Attachment 3** to this complaint. During the conversation involving many kids mentioned in **Attachment 3**, Plaintiff was videoed by one of the kids with a cell phone. Plaintiff maintained a "Mr. Rogers"-like demeanor through the entire interaction, both when she was, and when she was not being videoed.

79.     In the late morning of October 3, 2016 a woman approached Plaintiff in the highest garage level of Lucero Apartments, threatened to kick Plaintiff's ass repeatedly at the top of her lungs for speaking to her child, threw down her purse, and lunged aggressively at Plaintiff. Plaintiff called 911.

80.     Plaintiff reported the above incident to Eureka Multifamily, who admonished Plaintiff for having taken pictures of precocial child, who repeatedly degraded Plaintiff and engaged in disorderly conduct, while unsupervised. This admonishment made Plaintiff feel even less comfortable about approaching Eureka Multifamily staff about threatened assault, disorderly conduct, noise, and other conflicts — although Plaintiff felt discomfort interacting with Eureka Multifamily staff since the inception of the process for her initial certification for occupancy. Based on the tenor of Plaintiff's October 2, 2016 email, wishing for a team of adults with whom to help manage kid issues, this response is psychologically abusive and degrading.

81.     The aforementioned precocial child continued to badger Plaintiff periodically on Lucero Apartments premises until August 6, 2017 — purposely being disorderly right outside Plaintiff's back patio, knocking on Plaintiff's door occasionally for no reason, etc.

82.     On August 6, 2017, the precocial child again badgered Plaintiff outside her patio, creating noise Plaintiff could hear through earplugs, making it difficult for Plaintiff to quietly

enjoy the premises. The incident escalated to the point where the child said she would have her mother kick Plaintiff's ass. Plaintiff called the police. The police/security told her there was nothing they could do if Plaintiff did not make a recording of the incident, because without that, it was Plaintiff's word against theirs.

83.     Plaintiff downloaded an audio recording application for her cell phone specifically for this purpose of getting assault threats recorded, and went back out into the world the same night. The precocial child was hanging around the only safe stairwell Plaintiff can use with ease. An interaction ensued involving disorderly conduct on behalf of precocial child and her mother, and repeated threatened assault by the mother. Plaintiff has an audio recording of entire incident.

84.     On the evening of November 25, 2016, Plaintiff was the victim of terroristic threat, according to police, from a different Lucero Apartments resident. Plaintiff heard extremely loud, sustained yelling from adults coming from outside. Plaintiff went on her back patio and saw that the neighbor below her was having a shouting match with a group of adults on a balcony up a couple of floors and to the south. Plaintiff told her neighbor she couldn't be out there yelling at the top of her lungs like that. Neighbor responded by telling Plaintiff multiple times to come downstairs so she could bash Plaintiff's head into the concrete.

85.     On the day of January 3, 2017, a conflict erupted at Lucero Senior Bingo. Senior Bingo was, by its namesake, for Seniors, however, all residents were invited to attend. I attended somewhat regularly up until this date. Two young woman, seemingly in their early thirties, and one named Janiece, attended Senior Bingo on this day. The gifts for Senior Bingo are household supplies and the like. There are approximately three gifts, and then a grand prize. The number of bingo cards are restricted to a certain amount for fair play.

86.    One of the women in her thirties used twice as many bingo cards as the number allowed. Hope, a/k/a Esparanza, the woman in charge of Senior Bingo, didn't say anything, aside from announcing repeatedly the maximum number of bingo cards allowed. Plaintiff suspects Hope was afraid to address the cheater directly. After the woman in her thirties won all three prizes, which is unheard of, Plaintiff spoke up and said Senior Bingo is for seniors. Many of them are advanced seniors in wheelchairs or with walkers, and bingo is one of the few things they have left to give them joy in their week. Janiece chastised Plaintiff and attacked her verbally.

87.    Plaintiff doesn't even know if these individuals were residents at the time, because there is no secured perimeter for Lucero Apartments premises — and this goes for most incidents at Lucero Apartments.

88.    Shortly after the Senior Bingo incident, Plaintiff was unlocking her bike to go somewhere at the bike racks by the Wilson Street surface lot at Lucero Apartments. Janiece was walking by. Plaintiff generally saw Janiece periodically and said "hi" to attempt to make amends. Janice stopped, aggressively told Plaintiff not to say hi to her, and stared down Plaintiff. Plaintiff tried mightily to disengage and began trying to walk away with her bike. Janice blocked Plaintiff's path repeatedly, saying insulting things to Plaintiff.

89.    Plaintiff stopped trying to leave so that perhaps Janiece would get bored and continue on her way. Janiece eventually walked away. Plaintiff got on her bike and rode the slowly on the slight incline through the surface lot. When Plaintiff turned left onto Wilson Street, Janiece suddenly appeared and lunged at Plaintiff, as if she was going to knock Plaintiff off of her bike from the side.

90.     Because of these two incidents, related by Janiece's involvement, Plaintiff is afraid to return to Senior Bingo and has not done so since the incident.

91.     On or around October 8, 2017, Plaintiff was the victim of assault. On this evening, there was another group of older, very loud and unruly kids playing on the Splash Pad — "another" meaning, this tends to be a very regular occurrence, yet they usually do not result in assault.

92.     Plaintiff went downstairs and, rather than speak to the kids, thought that perhaps just taking pictures would give them the message that they were being watched and that their behavior was unacceptable. When Plaintiff arrived at the Splash Pad, the kids said, in a haughty tone, "we lit — we always lit" and there was a faint smell of marijuana in the air. Plaintiff took photos, and some of the kids hid their faces.

93.     Plaintiff continued walking towards the sidewalk by the Wilson Street surface lot, and faintly heard the kids telling an adult in a hallway southwest of the Splash Pad, something about pictures being taken of them. As Plaintiff arrived on the sidewalk, a woman came barreling toward Plaintiff, saying Plaintiff couldn't take pictures of her kids, and blocking Plaintiff's walking path. Plaintiff said she was not a journalist and based on Texas law, she absolutely could take pictures of them.

94.     Plaintiff continued walking towards the rock wall by the surface parking lot, with the intention of sitting on the rock wall by the public sidewalk. The mother and a group of kids followed, and approximately eight kids and the woman followed the Plaintiff to where she sat on the rock wall next to the Wilson Street surface lot. The group encircled Plaintiff and began taking a video of Plaintiff. Plaintiff proceeded to call 911. Plaintiff wanly and helplessly waved at the camera while surrounded by the group of people and on the phone with 911.

95.     The 911 dispatcher asked Plaintiff for personal information on the phone. Plaintiff walked north up the Wilson Street sidewalk to the end of the rock wall so that she could relay this information without being heard by the people stalking her. The group shortly followed and physically encircled Plaintiff. Plaintiff attempted to go back where she was sitting on the rock wall, where she was videoed. The group of kids with the mom made a circle engulfing Plaintiff, blocking her path on the sidewalk.

96.     Because there was no other entry way for Plaintiff to access besides the path they were blocking (there are gates that, if residents were given key FOB access, Plaintiff could have used to the north of the surface lot on Wilson Street), Plaintiff had nowhere to go. Plaintiff therefore walked down the sidewalk back toward her apartment, and into the kids blocking her path. An older child pushed Plaintiff. This scared another kid, who called off the pushing kid.

97.     Due to the culmination of incidents, Plaintiff was fearful of leaving her apartment and enjoying the premises and surround like she normally did, following this last described episode and for the entire winter thereafter. Because Plaintiff has no car, this means Plaintiff was virtually imprisoned in her apartment, save trips to the grocery store and the like, experiencing a great deal of isolation save the occasional interaction with a few friends.

98.     Aside from these incidents, Plaintiff has been the victim of disorderly conduct practically countless times, which is why the number she has called 311 greatly exceeds the number of incidents listed in this section.

99.     Plaintiff's $1,400.00 electric bicycle was tampered with daily for more than six months, prior to its theft from Lucero Apartment Homes grounds during the week of June 19, 2017.

100. Plaintiff's electric bicycle was tipped over practically daily, and the chain was often derailed.

101. Plaintiff's electric bike light mount was stolen off of her bike.

102. Plaintiff's electric bike repair kit was rifled through multiple times, with a flat tube stolen, and then $CO_2$ cartridges stolen.

103. A theft attempt was made on Plaintiff's electric bike from a Wilson Street bike rack on Lucero property. The new complex has inverted-u bike racks, but the racks are affixed to the concrete through accessible nuts and bolts. Attempted theft involved unscrewing the bolts to where the inverted-u bike rack was loose to the point of falling over.

104. Plaintiff began storing her electric bike inside her apartment at the Lucero property. As soon as Plaintiff moved to this modification, the elevator closest to Plaintiff's unit, broke. With a motor hub and battery pack, Plaintiff's electric bike is too heavy for a woman to carry up and down the stairs safely — at approximately 70 unwieldy pounds.

105. Plaintiff began using another elevator to get her bike to ground level. The security camera was turned around in this elevator so that it did not image the elevator. The elevator would reliably go all the way down to the ground floor two floors below her, then all the way up to the sixth floor, before arriving at and opening on Plaintiff's floor. After about two months of this, Plaintiff moved back to storing her electric bike on the bike rack, hoping the thief may have assumed she had moved due to her electric bicycle missing from the rack for two months.

106. Within a few months of Plaintiff again storing her electric bike at the bike racks on Lucero property, her electric bike was stolen.

107. There have been verbal reports to Plaintiff by on-site security of several cars stolen from Lucero Apartments property.

108.    On May 10, 2018, late in the evening, a young gentleman had two pit bulls off lead in grass adjacent to Wilson Street surface lot. When pit bulls saw notice of Plaintiff, bit bulls barked aggressively and lunged toward her. This is not exactly the sort of domestic tranquility that sets up for good sleep the rest of the night.

109.    A couple weeks later, Plaintiff saw same man with pit bulls along with a security guard. Security guard waved it off as no big deal.

110.    Plaintiff had evidence in the past of somebody being in her apartment when she was not home by way of a speaker she knew she had turned off, being on, and asked to have her lock changed.

111.    Many of the incidents that have occurred, including loud kids, etc., have involved people Plaintiff did not recognize. The lack of a fully gated perimeter when 3/4 of the perimeter is already gated, and there is a gate track for the vehicular entry way, is willfully negligent.

112.    The complex is thoroughly cameraed, but the signs of the camera state that they are not meant for tenant's safety or security.

### *Unrelenting Noise*

113.    Unrelenting noise at Lucero Apartments is mainly a function of leasing and law violations that are not enforced, poor structural building that makes way for noise, and inadequate oversight and enforcement.

114.    It is a leasing violation for children to play unattended. Children often do so nevertheless, and sometimes in great numbers — although given the structural arrangement of the property, it only takes one loud child to disrupt domestic tranquility. Children playing unattended appears to not be an enforced lease violation.

115.    Children — mostly toddlers — play in the hallways unattended during the day and evenings. Big wheels and other wheeled toys (scooters, etc.) with plastic wheels running over concrete seams in halls creates impact noise that reverberates through units. It is a leasing violation to play with wheeled toys on the premises. This violation appears to not be enforced, and because much of it occurs during the day without a security officer on the premises, it is difficult or impossible to enforce.

116.    Children running in the hallways also creates impact noise in units. Sometimes these kids also randomly knock on doors or bang pots and pans on people's doors.

117.    People play loud bass in their cars in the garage, or from the Wilson Street surface lot, or near other entrances, often multiple times a day. The loud bass in the garage reverberates through unit walls. The bass from the Wilson Street surface lot channels through the breezeway and into the Splash Pad area, which is surrounded by on three sides by concrete up many floors, with the floor being a fourth concreted side, creating an echo chamber for the bass. Plaintiff can hear bass with earplugs painfully jammed into her earholes and all windows and doors closed. This usually occurs multiple times during the day, during the hours when no security guard is on the premises.

118.    The Splash Pad area is an echo chamber due to poor construction. Kids play in the Splash Pad area and make an enormous amount of noise.

119.    Bouncing balls are a nuisance that create impact noise throughout units overlooking the Splash Pad area. Bouncing balls in the Splash Pad area is a completely unenforced leasing violation. Children often play unattended, yet sometimes are attended by adults that do not enforce appropriate noise levels. Often children have roared and screamed bloody murder for

hours on end. Plaintiff has experienced persistent elevated physiological arousal from this unrelenting noise, often right before attempting to go to sleep.

120.    The units at Lucero Apartments have inadequate insulation for the flooring. Plaintiff had chronic sleep deprivation for approximately the first year and a half of her residency at Lucero Apartments due to all the noises combined, including but not limited to impact noise from the unit above her. The impact noise from the unit above her has been the most unrelenting.

121.    Much of the impact noise created in the unit above Plaintiff is purposeful and negligent; however, at least some if not most of the noise would be abated with adequate sound attenuation material.

122.    Plaintiff has employed strategies to reduce her exposure to unrelenting noise, including using earplugs all day and night, running her kitchen vent fan on high after eating dinner so she mask overwhelming child play noise while eating dinner, and using white and brown noise to mask sounds during sleep. Despite these measures, Plaintiff has been consistently disturbed by unrelenting community noise, especially low frequency noises such as impact noise and loud car bass.

123.    Plaintiff's bedroom is not enclosed and has a space of wall missing from floor to ceiling that is approximately three feet wide, and on the side closest to the living room windows. This construction defect results in increased sound and light pollution exposure from the living room windows, into the bedroom.

124.    Plaintiff mediated a conflict between her neighbor across the hall and the woman in the unit above her, a dispute that involved impact noise from the above unit.

125.    Plaintiff has received complaints from other neighbors with whom she converses, about impact noise from the units above them. Every tenant to whom Plaintiff has mentioned impact noise from he unit above her, states they have the same complaint.

126.    Plaintiff witnessed impact noise when in the unit above hers, from the unit above that, which was orders of magnitude louder than the impact noise Plaintiff experiences in her own apartment, which is unbearable.

127.    Whereas impact noise from the unit above Plaintiff into her apartment is dramatically improved because of approximately five calls to the police made over a span of several months, Plaintiff still experiences daily impact noise from the unit above her that either disrupts her sleep or her ability to focus on work — just, with less frequency across the day. Most disturbing, impact noise and chair squeaks across the floor reliably begin right over her bed, exactly at bedtime — or, during the day, at precisely the time she is trying to take a nap to recover from sleep deprivation experienced from impact noise the preceding night.

128.    Plaintiff endured loud music most nights coming up through floor from tenant in Unit 3308 — the tenant who terroristically threatened Plaintiff. This loud music occurred the entire time the tenant resided in unit 3308. The music often began right as Plaintiff was attempting to go to sleep. Plaintiff believes this tenant was kicked out for the terroristic threat, so the music ended sometime relatively shortly after November 25, 2016. During this time, Plaintiff was using both earplugs and white noise generation to mask noise, and still, the impact noise and music were audible, unrelenting, and intrusive.

129.    Landscapers created noise disturbances regularly from approximately February to April 2018. It sounded like they ran the riding mower over a 5' square area and weed-whacked and leaf blew after that, virtually every day. The pattern was so bizarre that Plaintiff questioned

whether these landscapers were actually contracted to do landscape work on Lucero Apartments premises.

130.    Unusually frequent landscape frequency was an intermittent problem before that, meaning it occurred a great deal when Eureka Multifamily management was in place, then abated, then increased again, then abated after Plaintiff sent a letter to Dominium Management and others regarding the problem, then increased for the February to April 2018 period, and has since abated for the most part, for the time being.

131.    On or around the week of March 27, 2017, Lucero Maintenance conducted fire alarm tests. These tests involved the fire alarm going off approximately every two minutes — both the alarm within the unit as well as the complex-wide alarm — for several hours in a row, multiple days. The alarms inside the apartments that are connected to the complex-wide alarm are estimated at approximately 90 dB or higher — way beyond safe levels for human hearing.

132.    Fire alarms for individual units go off sporadically with relative regularity, often going off for 30 minutes or more. Recently, a fire alarm for an individual unit did so during leasing office operating hours, for a prolonged period of time. Plaintiff had to notify the leasing office, and generally often calls the Fire Department to have these alarms shut off.

133.    Lack of 24-hour, on-foot security that is capable of assessing the situation and turning off the alarm in the event of non-emergency, makes for just another way in which Plaintiff's right to domestic tranquility is violated. With all the sources of noise taken together, variable noise is always daily, if not practically constant throughout the day and night.

134.    On or around June 11, 2018, Lucero Apartments residents received a message marked "Urgent", with notification that a fire safety check was to occur on June 13 and June 14 of that

week. The protocol has proved to be the same as for the March 2017 fire safety inspection for the prior year.

135.    For the 173 units, the fire alarm is set off, complex wide, to test that each and every alarm goes off inside the unit and is attached to the overall complex-wide alarm. This means that theoretically, for two days straight between 9a-5p, residents are exposed to constant beeping in the bedroom, which is also designated as an office with a built-in desk, at about 90 dB. Plaintiff chose not to test the theory of whether this would be an all-day occurrence after being exposed to more of an hour of this noise, and left her apartment.

136.    Just prior to this, Plaintiff's 90 dB alarm began beeping in her bedroom / office approximately every 30 sec at 9p on Sunday, June 10, for about five beeps. This happened again during the day on Tuesday, June 12, for about 20 beeps.

137.    As just mentioned, Plaintiff had to leave her home on June 13 and June 14, 2018, to avoid hearing damage in her apartment from repeated and unrelenting 90 mdB alarm triggers of a series of three second-long pulses, with a second of silence in between.

138.    Fire safety inspections are supposed to include a maintenance visit to all apartments for fire extinguisher inspection and a change of the smoke alarm battery. All apartment entries are required to bring with them a notice of entry.

139.    No notice of entry was left in Plaintiff's apartment during the fire safety inspection period. There was no new evidence of a fire extinguisher check (i.e., hole punches on the maintenance tag for the fire extinguisher did not change).

140.    At 11:35p the following Saturday (June 16, 2018), a low battery beep of about every 30-45 sec began emitting from the smoke alarm in Plaintiff's bedroom. Because the smoke alarm is designed in a manner to prevent residents from disabling the battery, how to change the battery

is not intuitive. Plaintiff called first responders to change the battery to because she received no update from the leasing office about after-hours maintenance, after the previous after-hours maintenance number became deactivated.

141.     On June 22, 2018, Plaintiff's neighbor asked for Plaintiff's help in assessing problems with her AC and thermostat. While in neighbor's apartment, Plaintiff noted that the low battery on the smoke alarm was beeping in her neighbor's apartment as well.

## UTILITIES MISMANAGEMENT AT LUCERO APARTMENT HOMES

142.     In 2017, Plaintiff's water bill doubled. Plaintiff asked for information from Eureka Multifamily regarding the change. No information was ever provided. Since then, a Lucero Apartments resident informed Plaintiff that at that time Eureka Multifamily began charging residents for Splash Pad water. Plaintiff does not have confirmation of this information, however, Plaintiff's water usage habits did not change substantially at that time or thereafter, yet her water bills again reliably decreased by half once the Splash Pad was not operating during the time when Dominium Management began providing metered water bills again.

143.     Residents in HUD-assisted housing are required to be current with utilities to retain occupancy of their unit. Because of this, there is a government-assisted utility allowance provided to all residents. In 2017, Eureka Management burdened Plaintiff with paperwork by requesting utility bills multiple times, then used those bills along with the bills of other residents to calculate a utility allowance decrease for all residents, providing residents an opportunity to appeal the decision. The property's Tenant's Association appealed the decrease, and the decrease was reversed. Still, the request for information and the notice of decrease is burdensome for both leasing staff and residents, is stressful and overly intrusive for residents, and therefore shouldn't happen in the first place.

144.   Dominium Management took charge of managing Lucero Apartments on or around August 2017. Plaintiff was accustomed to receiving her water bill from Eureka Multifamily on or around the 1st of the month. Plaintiff did not receive a water bill as she was accustomed, after Dominium Management took control of Lucero Apartments.

145.   Because staying current with utilities is a prerequisite for maintaining occupancy in HUD-assisted housing, Plaintiff felt anxiety about the lack of a water bill and went to the leasing office to inquire about it. Dominium Management staff stated there was no metered water billing set up, yet Plaintiff was required to pay full amount of her previous water bill.

146.   The previous amount of Plaintiff's water bill was at the unusually high double amount for her, at approximately $46. Because her water usage typically hovered at around half that, Plaintiff felt angst over the lack of metering along with the demand that she pay a high amount for water usage — from entities with whom she is not allowed to argue based on the lease terms, lest she incur a leasing violation. This angst was heightened by the requirement to stay current with utilities to retain her housing — not to mention, the ongoing problems Plaintiff confronted with leasing office management.

147.   Dominium Management staff kept Plaintiff in the water bill holding pattern of angst detailed above for approximately six months. Plaintiff asked every month when she paid $46 and change for her water, if metered billing was set up yet. The answer was always no.

148.   Finally, Plaintiff examined her water bill amount from the same time the previous year. That is, some time on or around December 2017, Plaintiff examined her metered water bill from Eureka Multifamily from December 2016. The amount was approximately $23. Plaintiff went to Dominium Management staff and stated she would be paying the amount she paid for water at the same time last year, this year, showed staff the check paid for water in the previous

year, and stated she would continue to do so until Dominium Management began billing Plaintiff for metered water usage.

149.     In January 2018, Lucero residents received another notice of impending decrease in utility allowance from Dominium Management, with the opportunity to dispute the decrease.

150.     Dominium Management then stated that metered billing was to begin on or around January 2018. Plaintiff did not receive a metered water bill until around April 7, 2018, with a due date of April 1, in an envelope postmarked April 5. Thus, Plaintiff experienced chronic stress about her housing status and unfair billing practices for approximately eight months.

151.     Despite an overwhelming abundance and comprehensiveness of apparent infrastructure for providing internet to Lucero Apartments residents, management has not provided any information regarding internet service provision or access on the property to Plaintiff since her initial occupancy.

### *Trash and Recycling*

152.     Trash and recycling is a regular problem on Lucero Apartments property.

153.     Trash periodically does not get picked up and over-accumulates on the property.

154.     Bulk trash is regularly strewn about and viewable from the street.

155.     Recycling provisions involve only one dumpster for the entire 173 unit property.

156.     The one recycling dumpster on the property is always filled with at least 50% non-recyclable trash, conservatively, and not just trash that is questionable with regards to recycling. For example, many people have the mistaken impression that pizza boxes are recyclable, because they are made of cardboard. In addition to pizza boxes regularly appearing in the recycle bin, however, there are also obviously non-recyclable items like carpet, tree branches, furniture, and trash bags full of regular, non-recyclable trash.

157.   The City of Austin has a zero-waste initiative in place with a target of putting little to no trash in landfills by the year 2040, or sooner.

158.   Trash chutes regularly become overfilled, and then residents receive threatening notices about leaving trash bags accumulated in the trash chute alcoves for each building.

159.   Current code by the City of Austin stipulates that for multifamily properties of five or more units, property owners and management must arrange for private hauling.

160.   Over 50% of residents in the City of Austin are renters, and there are many multifamily properties with condominiums.

*Maintenance*

161.   Plaintiff's relatively recent requests for maintenance by way of fixing shower liner and kitchen sprayer have gone unheeded.

162.   Dominium Management's / Property Owner's muddled voicemail message indicates that tenants must call a locksmith if they have a lock-out after hours, despite leasing office / maintenance possessing keys on site. The average cost of a locksmith for lock-out is around $60.

**OTHER HARASSING, ILLEGAL, AND UNDIGNIFIED TREATMENT FROM LEASING OFFICE MANAGEMENT**

163.   When applying for occupancy, Eureka failed to inform Plaintiff that (a) sporadic income was not counted in HUD's considerations for rent calculation during the annual certification process, and (b) having a job was not required for Plaintiff to take up occupancy at Lucero Apartments or receive Section 8 benefits under HUD regulation. Plaintiff made it clear she was unaware of this information.

164.   When applying for occupancy, Eureka requested to contact Plaintiff's employer for her sporadic babysitting job. At the time, Plaintiff was unaware of HUD regulations governing

sporadic income and attempted to comply. Plaintiff's employer felt uncomfortable with governmental intrusion into their working relationship with Plaintiff, and fired Plaintiff as a direct result of Eureka's request — and indeed, while Plaintiff was in the office of Eureka Multifamily, attempting to connect Eureka Multifamily with the employer to honor Eureka Multifamily's request.

165.    Eureka Multifamily staff burdened Plaintiff with two updated applications within a matter of days, after she had already submitted an application earlier, when applying to take up occupancy in a Lucero unit. This overwhelming paperwork burden was due to Eureka's cause of Plaintiff's sudden change in (lack of) sporadic income as a result of Eureka's wish to contact Plaintiff's sporadic babysitting employer — even though the income was supposed to not count as income in the first place.

166.    Because Eureka Multifamily failed to notify Plaintiff that she was not required to be employed in order to be a resident at Lucero Apartment Homes, Plaintiff scrambled to find a job, and began working as a hostess at Vinaigrette Austin in July 2016.

167.    Eureka Multifamily reportedly by their own admission used maximum and not minimum or average hours reported by Vinaigrette Austin in calculating Plaintiff's interim recertification of rent based on her new job.

168.    That is, Vinaigrette Austin reported a range of 12-20 hours a week for Plaintiff's work to Eureka staff. Eureka staff sternly and coldly announced to Plaintiff that they would be calculating her rent based on her working 20 hours a week. This was not a high paying job, and Plaintiff worked less than 20 hours a week the entire time she was employed by Vinaigrette. Plaintiff believes this means at times she paid 40-60% of her beyond meager income in rent, rather than the required 20-30%.

169. On or around September 15, 2016, Plaintiff noticed that the bell inside the elevator closest to her apartment was painfully loud. Plaintiff downloaded a phone app for determining dB levels and clocked the bell at 94 dB, ringing inside the elevator with the doors closed, which is against the law. Plaintiff contacted Eureka Multifamily about the issue, whose tone was characteristically rude and flippant, and that their elevator certifications were valid, therefore they believed no action was required on their part.

170. Plaintiff had to address the issue herself with the relevant elevator regulatory agency directly, which addressed the problem, being concerned as she was for the residents (especially developing children with developing ears and nervous systems) who regularly use the elevator. Plaintiff has never used the elevator regularly herself, but having training in early brain development in auditory neurobiology, it was torment for Plaintiff to think that the hearing and fight-flight response of children living in the complex could be permanently damaged due to exposure to an illegally loud elevator bell.

171. As noted in the "Unrelenting Noise" section above, Plaintiff began experiencing violation of domestic tranquility by unrelenting impact noise from the neighbor above her, shortly after taking up residency at Lucero. This violation of domestic tranquility was and is daily, constant, and often purposeful.

172. Plaintiff attempted several times to address the problem directly with the tenant above her, with whom Plaintiff was friendly at the time, but to no avail. Said tenant's claim that "ghosts" were making the noise said tenant aggressed toward Plaintiff.

173. After some months of attempting to address the problem on her own, Plaintiff realized this noise was a pattern from which Plaintiff could not escape by way of her own action

with the tenant residing in the unit above her. Therefore, Plaintiff notified Eureka Management about the problem. Eureka then stated they had a new unit available for Plaintiff.

174.    On or around October 3, 2016, Plaintiff went in to the leasing office to inquire about the new unit available to her. By Plaintiff's recollection, she stated that she could not bear the stress of moving yet again, because she had already moved approximately five times within the last year, under very stressful circumstances, and sometimes living in squalor.

175.    Plaintiff asked instead that Eureka Multifamily move the tenant above her, and the offender of the noise, to a different unit. Eureka Multifamily staff was degrading, rude, and hostile, stating Plaintiff was no different than any other resident at Lucero, indicating Eureka Multifamily believed Plaintiff's desire for domestic tranquility made Plaintiff think she was somehow special compared to other residents, and denied Plaintiff's request.

176.    On or around October 3, 2016, Plaintiff went to Eureka Multifamily staff to address harassment and disorderly conduct by a juvenile, of whom Plaintiff had taken a picture and sent to Eureka Multifamily management. Plaintiff was degraded for taking the picture and made to sound as though she was at fault for being harassed by an unattended juvenile.

177.    On January 18, 2017, Plaintiff again asked Eureka Multifamily to move the tenant in the unit above hers, to a different unit. Plaintiff asked this mainly because Plaintiff did and does not wish to live under said tenant any longer. In addition, said tenant has repeatedly expressed the wish to live on the bottom floor or in the old apartments in the property adjacent to Lucero Apartments; therefore, it would be a win-win situation. The request was denied.

178.    Since then, Plaintiff has observed new, young tenants in a ground-level apartment near the mailboxes. Plaintiff believes Lucero Apartments had multiple opportunities to move the tenant in the unit above her, to a different unit which would make both said tenant and Plaintiff

happier, and which would likely be safer (see **Attachment 4** under Sealing Motion) — yet willfully neglected to do so.

179.    On January 27, 2017, Plaintiff attempted to obtain help from Eureka Multifamily staff with moving a large, old couch down to the dumpsters. Eureka Multifamily attempted to charge Plaintiff $100 for the move and was very rude to Plaintiff in the process. Plaintiff had to contact City of Austin Code Enforcement to get involved. The charge was reversed, the employee requesting the $100 suddenly stopped working there, and the work was completed by maintenance.

180.    After Plaintiff had been in her apartment for over a year, and was still experiencing the same lack of domestic tranquility by way of relentless impact noise from the same tenant in the unit above her, she went to the leasing office to again inquire about the possibility of being moved to a different unit. This was despite the fact that Plaintiff preferred to have the resident above her moved, and have adequate flooring insulation installed before a new occupant was moved into that unit.

181.    Nevertheless, Plaintiff felt that enough time had passed to where she was no longer experiencing moving-related stress, after having moved five times within a year just preceding her occupancy at Lucero Apartments.

182.    At this time, Dominium Management was in place for managing Lucero Apartments. Plaintiff was met with a wall of attitude and righteous indignation by a young lady probably young enough to be Plaintiff's daughter, who told Plaintiff that the waiting list was four years long, and there was no way Plaintiff could be moved.

183.    Both Eureka Multifamily and Dominium Management have consistently failed to provide the required documentation at annual recertification request every year — the Fact Sheet

(Appendix 7), and the EIV. Although it is provided with the initial sign-on paperwork when taking up occupancy, this initial sign-on packet is 115 pages with addenda.

184.    By Spring 2017, Plaintiff had undergone paperwork with Eureka Multifamily approximately seven times for interim recertifications, notwithstanding multiple asks for utility bills for the utility allowance decrease proposal. Therefore, approximately once per month there were changes to Plaintiff's required rent amount involving multiple trips to the leasing office, all stressful due to unknowns about how much the new rent would be, or if rent decreases would take effect in a timely enough fashion for Plaintiff to avoid homelessness, given her meager liquid assets — as well as involving the typically capricious and hostile nature of the leasing staff. The persistent and degrading mistreatment of Plaintiff whenever she goes to the leasing only adds to the torment Plaintiff experiences during these visits.

185.    Because of this overwhelming paperwork burden, when Plaintiff got another job as a part-time Barista making $9 an hour plus tips in April 2017, Plaintiff wanted to ensure she reported pay for her interim recertification in a manner that would not require further reporting requirements — partly because of overwhelming paperwork burden, and partly because she felt intimidated by leasing staff, and going to the leasing office at that point made her feel nauseous.

186.    Plaintiff was informed by her new employer that she may be hired temporarily, or it may turn into a management position.

187.    Plaintiff informed Eureka Management of this fact, not aware at the time that temporary employment does not factor in to rent recalculations. Eureka Management required her to enter an interim recertification request.

188.    Plaintiff found that her hours working as a Barista fluctuated based on both number of shifts per week as well as number of hours per shift. Plaintiff also found her tips fluctuated based

on the type of shift (day vs. night; weekday vs. weekend). Plaintiff had difficulty arriving at a calculation of her monthly income that would unequivocally satisfy the lack of need to report a change in income of $200, as stated in a lease addendum.

189.    Plaintiff went to Eureka staff four times, sometimes because Eureka staff did not know how to categorize her income, and sometimes attempting to appropriately provide interim recertification paperwork with a correct amount. The third time she went to management, with an air of completely seeking help for her calculations. Eureka staff degraded Plaintiff, refused to assist her, aggressively told her to just submit the paperwork in a hostile fashion, and threatened Plaintiff that she could face adverse action if she did not submit the paperwork within the week. Plaintiff did so on her fourth visit regarding this one interim recertification.

190.    On April 18, 2018, Plaintiff sent a congenial, pleasant email to Dominium Management regarding the persistent lack of domestic tranquility experienced by Plaintiff by way of the tenant residing in the unit above her (see **Attachment 5**).

191.    On April 19, 2018, Dominium Management responded to Plaintiff's April 18 email by threatening Plaintiff about calling the police on the tenant residing in the unit above Plaintiff. The letter mischaracterized tenant's persistent violation of Plaintiff's constitutional right to domestic tranquility, and instead characterized Plaintiff's calling the police as "aggression" toward said tenant. The letter threatened Plaintiff's revocation of her participation in the Section 8 program if she contacted the police again regarding the behavior of any of her neighbors (see **Attachment 6**).

192.    It is notable that Plaintiff has never intimidated or aggressed towards anybody at Lucero Apartments, verbally or otherwise, and instead has been repeatedly victimized; the tenant residing in the unit above Plaintiff regularly answers her door with a steak knife pointed at the

person knocking, has been incredibly rude and insulting to Plaintiff, and Plaintiff has never returned that behavior to her; and, by her recollection Plaintiff usually if not always called 311 in reference to said tenant's behavior, and not the stated 911 in Dominium Management's letter. Plaintiff made calls about said tenant approximately five times, spaced out over a period of several months — and after she repeatedly received both general mistreatment from Lucero Apartments management staff, as well as specific lack of redress of / lack of due process for the chronic problem involving the tenant in the unit above her.

193.    After receipt of the April 19, 2018 letter, Plaintiff has been afraid to contact emergency personnel regarding incidents affecting Plaintiff's heath or safety by individuals (seemingly residents or residents' guests) because of the letter.

194.    On April 20, 2018, Dominium Management provided Plaintiff with an annual recertification requirement letter (see **Attachment 7**). Leasing office rules state the recertification process begins some time in March. The date of the letter had been whited out and written over the white-out, which is against government regulation. Governmental documents require lines drawn through the incorrect information and do not permit white-out.

195.    The April 20, 2018 annual recertification letter showed no OMB number, valid or otherwise, or any mention thereof. It is Plaintiff's understanding that she is not required to respond to an annual recertification letter without an OMB number or mention thereof. However, that does not preclude the leasing office staff, already shown to be bad actors, from taking illegal adverse action against the security of Plaintiff's domicile. Therefore, Plaintiff felt intimidated into engaging in the annual recertification process anyhow, based on Lucero Apartment staffs' persistent violation of rule and regulation.

196.   On May 2, 2018 Plaintiff specifically told Dominium Management staff that the Eureka Multifamily staff preceding them had been hostile and threatening towards her regarding interim recertification paperwork, and on more than one occasion during this process, required Plaintiff to return to her apartment three and four times to get more paperwork. Plaintiff requested that Dominium Management work with her to minimize the number of meetings, amount of paperwork, and the stress involved with the annual recertification process (see **Attachment 8**).

197.   On May 2, 2018, after first notice of annual recertification, Dominium Management staff indicated in writing via email that they would be counting Plaintiff's sporadic income as annual income, would not count Plaintiff's income based on her bank accounts, and if Plaintiff "...received over $200 and did not report it, this is a violation and [Plaintiff] will have to repay HUD (see **Attachment 9**)."

198.   On May 3, 2018, Plaintiff attempted to seek advice through HUD-PIHRC@tngusa.net regarding the annual recertification letter OMB problem and other issues.

199.   In total, Plaintiff spent three full days preparing her annual recertification paperwork. Due to events completely beyond her control, Plaintiff had several types of income exempt from annual recertification.

200.   Because Lucero Apartments management staff have always required the six most recent bank statements for annual recertification, Plaintiff was required to provide proof to the leasing office that these types of income were exempt from consideration during her annual recertification, yet fell out of the 120 day window requirement for documents. Plaintiff avers this violates 5 CFR Part 1320 *Controlling Paperwork Burdens on the Public; Regulatory Changes Reflecting Recodification of the Paperwork Reduction Act.*

201.    As of May 4, 2018, Plaintiff had finished sending all necessary annual recertification documents to Dominium Management staff via email to the best of her knowledge, apart from her original identification and citizenship documents.

202.    On May 7, 2018, Plaintiff received a response from HUD-PIHRC@tngusa.net to her May 3, 2018 inquiry, was told it was the wrong entity with whom to confer, yet was not given the due process of having the email forwarded to the appropriate organization, or given a proper contact.

203.    On May 8, 2018, Plaintiff attended a mutually agreed upon meeting time for her annual recertification, bringing the required original documents of her Social Security Card, Birth Certificate, and Driver's License with her to Dominium Management staff on site at Lucero Apartments.

204.    During this meeting, Dominium Management management goaded and tormented Plaintiff and misrepresented multiple HUD laws. Plaintiff recorded the conversation for provision to The Court upon request during the process of discovery.

205.    Dominium Management staff claimed that despite Plaintiff's assertion, Dominium Management was not required to provide an EIV Brochure or Appendix 7 of *HUD Handbook 4350.3: Occupancy Requirements of Subsidized Multifamily Housing Programs* to Plaintiff for annual recertification purposes.

206.    Despite Plaintiff having sent all necessary financial documents for annual recertification to Dominium Management staff via email, Dominium Management staff refused to process Plaintiff's annual recertification during their May 8 meeting because she did not bring printed, hard copy versions of her financial documentation with her to the leasing office.

207.    Despite Plaintiff's request that Dominium Management staff email Plaintiff with any requests prior to the meeting, Dominium Management did not notify Plaintiff ahead of time via email that they required Plaintiff to print out the voluminous financial documents Plaintiff had emailed Dominium Management, for the May 8 annual recertification meeting.

208.    Also during this meeting, Plaintiff asserted that she spent multiple full days compiling the paperwork and sent them to Dominium Management via email; that the previous leasing office management printed out documents for residents; and that Plaintiff believed what was being asked of her was an overwhelming paperwork burden and therefore a violation of her rights.

209.    In response to Plaintiff's overwhelming paperwork burden statement, Dominium Management staff still refused to process Plaintiff's annual recertification, claiming it was a Fair Housing issue, and if they printed out Plaintiff's documents, they had to print out all residents' documents.

210.    Nevertheless, Plaintiff attempted to provide her original Birth Certificate, Social Security Card, and Driver's License to Dominium staff so they could verify them and make copies. Dominium Management staff refused to examine or make copies of these, her original identification and citizen documents. Dominium Management staff asserted that Plaintiff must print out all financial documents for Dominium Management and reschedule her annual recertification appointment for a later date. Notably, the on-site Community Center with computers and printers for which residents possess key FOB access and for which was originally designed for resident use, was no longer accessible to tenants at the time.

211.    During the May 8 meeting, Plaintiff asked for a reschedule date. Dominium Management refused to provide her a rescheduling date and proffered no reason why.

212.    Also during the May 8 meeting, when Plaintiff asserted that the previous leasing office had printed out residents' annual recertification documents, staff curtly and repeatedly stated, "We are not the previous leasing office."

213.    Having recently received a letter from Dominium Management staff stating they would be processing background checks soon, and given the other many law violations of both Dominium Management and Eureka Multifamily, this statement caused Plaintiff sudden and additional psychological stress over whether Dominium Management staff planned to take adverse action against Plaintiff over the probationary term on her record — the very probationary term Eureka Multifamily illegally forced Plaintiff into plea bargaining.

214.    This stress induced Plaintiff to spend more time researching the law on background checks as applicable to her circumstance, which legally counts as paperwork burden.

215.    After the May 8 meeting, Dominium Management agreed via email to print out Plaintiff's documents for another annual recertification meeting. Plaintiff communicated OMB number requirements on requests for information in writing via email to the leasing office (see **Attachment 10**), and asked that an annual recertification letter be sent to her with a valid OMB number. Plaintiff and Dominium Management established a mutually agreeable second annual recertification meeting of May 17, 2018.

216.    On May 9, 2018, Dominium Management staff responded to the Plaintiff's OMB email with the following: "Let me reiterate the importance of calling the office at your most earliest convenience to schedule the recert appointment to avoid the termination of the Project Based Section 8 Program for your apartment (see **Attachment 10**)."

217.    On May 17, 2018, Plaintiff attended the second scheduled meeting for annual recertification, first inquiring about the annual recertification letter with a valid OMB number she

has previously requested via email. Dominium Management staff acted perplexed, as if it was the first time they had ever heard the OMB acronym in their lives, despite their supposed at least two previous training meetings that were posted as reasons for the leasing office being closed during office hours, as well as their reported former experience at other HUD-assisted properties — and, also despite Plaintiff's recent email communication and provision of documentation about OMB numbers directly to Dominium Management staff, which included a request for an annual recertification letter with a valid OMB number, and, their response to her OMB email.

218.   Plaintiff stated during the meeting that she was not obliged to respond to a letter without valid OMB number, and if they wished to have a meeting without providing the necessary documentation, it would need to be scheduled until a later date.

219.   On May 22, 2018, Dominium Management sent Plaintiff yet another letter threatening Plaintiff, this time, with revocation of Plaintiff's lease agreement and / or HUD financial assistance if Plaintiff did not respond immediately, still in response to an annual recertification letter with no OMB number or mention thereof (see **Attachment 11**). This was on a day when Plaintiff worked 14 hours and had two people request job interviews by phone that week.

220.   On May 23, 2018, Plaintiff sent a follow-up email to Dominium Management again reiterating OMB requirements, and that she had sent those requirement to them via email.

221.   On May 23, 2018, Plaintiff reported a Dominium Management staff member to the Austin Police Department for harassment. To date as of June 12, 2018, Plaintiff is still experiencing chronic stress over whether Dominium Management will mark this call (her legal right) as a leasing violation, and is generally afraid to call the police regarding the illegal behavior of any person on Lucero Apartments premises that adversely impacts Plaintiff.

222.    On or around May 25, 2018, Dominium Management sent Plaintiff a notice to sign what was characterized to her only as a utility allowance decrease agreement, yet reflected an anticipated rent subsidy voucher.

223.    As of July 3, 2018, Plaintiff is still receiving notices about her annual recertification that are unclear, bearing unreasonable constraints, and asking Plaintiff to take action for no reason (see **Attachment 12**).

224.    Requests for annual recertification often state "immediately" or "as soon as possible", without statement of any deadline, much or a reasonable deadline, so that residents may have both the time to prepare their documents and arrange their schedule to accommodate the request. When a deadline is stated, it is often "within seven days of receipt of this notice." Another tenant complained to Plaintiff that her work requires she request schedule changes two weeks in advance.

225.    The lease information provides no email address for contacting Property Owner about issues at the property, imposing an additional layer of burden to communication at this late technological age.

226.    The lease agreement is too strict about wall hangings, stating only picture hooks may be used, rather than maximally allowed hole or screw width and a statement about a reasonable number of holes in the walls. The lease agreement also prohibits tenants from wearing tank tops to the leasing office. This is Texas. Just bar tight-fitting or overly revealing clothing.

227.    The lease agreement states that residents must report all employment, without specifying that temporary or sporadic employment not be included. Here, temporary or sporadic employment is identical in nature to all other forms of exempt income and therefore the wording needs to be changed to reflect the lack of a need to report all employment.

228.    Most notices for entry of Plaintiff's unit by Lucero staff or a representative — and there have been numerous — come less than 24 hours before the planned entry. The remaining notices typically provide less than a week's notice. These notices have included random inspections, required inspections (these have occurred close in time together in the past), filter changes (every three months), multiple requirements for entry to fix a countertop (a fix that never occurred), a requirement to put a sticker below the sink, a requirement to put a sticker on the thermostat, and multiple bug treatments.

229.    Residents have been informed that their apartment should be very clean for any entry to their unit.

230.    There have been approximately 23 requests for entry in 23 months, most of which have occurred within less than 24 hours of entry. This tally does not include requested maintenance. This has contributed to Plaintiff's constant feeling of vigilance and need to adjust her schedule at the last minute in order to conform to the leasing office's unreasonable standards to avoid a lease violation, because there are crumbs in the refrigerator gasket, for example (this is actually a specific demand made by Eureka Multifamily staff — that the top of the refrigerator door gasket be free of crumbs in order to pass an inspection).

231.    This is despite the fact that the Tenants' Association worked hard to advocate for a decrease in apartment entries in the past. According to the Tenants' Association, there was brief relief of entry number, followed by an increase in entry number again.

232.    On September 7, 2017, Plaintiff sent a letter to Dominium Management asserting that an unreasonably large number of requested entries into residents' apartments were occurring — specifically for this letter, three within the last month — and also that most of the requests

brought with them an unreasonably last-minute timeframe, citing the adverse psychological effects of the nature of these notices and entries.

233.    Requests for entries are still high since then, and one was made with no reason proffered.

234.    Two bug treatment notices — one on January 3, 2018, and the other June 27, 2018 — were left in Plaintiff's door at 5p the previous day, providing less than 24 hours' notice.

## PREMISES ARE UNREASONABLY RESTRICTIVE FOR MOVEMENT OF PLAINTIFF IN A MANNER WHICH THREATENS PLAINTIFF'S SAFETY

235.    Two-thirds of the premises are enclosed by a gate, yet Plaintiff has observed adults squeezing through the gate bars to gain entry at locations that were convenient for them.

236.    There are only two accessible entryways to the 173 unit property, possessing six buildings and spanning the equivalent of two street blocks.

237.    The southernmost nature of these two entryways is such that the shortest path involves use of a very busy and exhaust-filled street for both vehicular (including bicycle) and foot traffic (see **Attachment 13**).

238.    The east most fence has two emergency exits at the north and central parts of the complex via which residents are not permitted to traverse. These emergency exits are traversable only by foot. They are not ADA-accessible. They intersect less busy neighborhood streets with good crosswalks, abundant shade cover, and significantly less car traffic and exhaust. They are the closest entry / exit points to a public junior high school within walking distance. Plaintiff has observed young children with backpacks squeezing through the bars at or near these gates, presumably coming home from school via the safer and also more direct route.

239.   The two emergency gates are also closer to two bus stops with less exhaust and less traffic (the #1 at Live Oak and S Congress, the #10 at Live Oak and S 1st Street), because the stops are near an intersection with only one busy, four-lane through-street.

240.   This is in contrast to the bus stops for the same routes just south of there, which are positioned at the intersection of two busy four-lane streets and major urban thoroughfares (the #1 at Oltorf and S Congress, and the #10 Oltorf and S 1st Street). These stops impose significantly worse exhaust on tenants who are bus riders, both for the walk to the bus stops as well as the wait at the bus stops. These are the bus stops that having only the two south-most regular entry and exit points for Lucero Apartments, encourages Plaintiff and other Lucero residents to use.

241.   Not owning a car, Plaintiff grocery shops at the closest grocery store and must carry her heavy groceries from the grocery store to her home on foot or bicycle. Use of the emergency-only exits would likewise provide a less exhaust-ridden route to the grocery store.

242.   The prevention of the use of the emergency exits for regular foot traffic adds three minutes of travel time just to exit the premises, for Plaintiff to get where she needs to go — usually, a less exhaust-filled bus stop, and bus stops are time-dependent. This adds additional planning to Plaintiff's already exceedingly long commutes. Plaintiff has taken many bus trips within the 3-8 mile range that take an hour one way, when walking and waiting time are added.

243.   Plaintiff is not always feeling good or not menstruating, and obtaining flu medicine or tampons with added travel time and exhaust to and from the grocery store is a physical burden.

244.   Plaintiff finds groceries are heavy, and while she can manage backpacking her groceries to and from the grocery store, she finds she often uses the more exhaust-laden route because of the lack of availability of the emergency exits because it is shorter, she is not a body

builder, and she wishes to not experience permanent spinal compression or something crazy like that.

245.    It is important to note that there is a great deal of public foot traffic through the neighborhood on adjacent neighborhood streets due to the proximity of bus stops for different routes, as well as access to homeless services by a nearby church. This foot traffic is not impeded in any way, and Plaintiff avers the foot traffic added from regular use of the east most gates at Lucero Apartments would be minimal, given that residents already walk on these streets, primarily returning from school.

246.    It is further important to note that unlike many of the people traversing the neighborhood to access connecting bus stops, Lucero Apartments residents actually reside in the neighborhood and ought to have the freedom to move conveniently in areas with shade and fresh air to breathe.

247.    Plaintiff has experienced a lack of safety due to her inability to escape hostile situations or avoid problematic individuals because of only one entry point of the premises on the east side of the premises.

248.    Plaintiff has experienced stalking by people she believes do not live on the premises, because anybody can walk in through the areas which are not fenced, and even those that are.

249.    Plaintiff communicated concerns about premises security in writing to Dominium Management, HUD, and other relevant parties, stating that the entire premises needs to be securely gated with gates at the vehicular points of entry.

250.    In this communication, Plaintiff also asked that residents be given non-emergency key FOB entry and exit access to the east side emergency gates, making them regular entry and exit points for the residents of Lucero Apartments, and claiming it was the constitutional right of

Plaintiff and other residents of Lucero Apartments to freedom of movement, to use these emergency exits as regular entry and exit points.

251.     Within approximately a week of Plaintiff communicating her concerns and making requests to Lucero Apartments and other parties, workers arrived to install an alarm on the central emergency gate on the east side, thereby further restricting their use.

252.     The installed alarm went off so many times due to Lucero residents and / or guests using the newly alarmed, gated exit that several neighbors residing adjacent to, yet not in Lucero Apartments complained to the Zone Representative of Bouldin Creek Neighborhood Association about the relentless alarm noise.

253.     As a result of these complaints, the Bouldin Creek Neighborhood Association Zone Representative approached Dominium Management staff about the problem, and the Bouldin Creek Neighborhood Association newsletter reflected concerns about how Lucero Apartments is being managed.

254.     On July 3, 2018, an elderly Lucero resident carrying groceries appeared to motion to Plaintiff to open one of the east most gates so she could enter. Plaintiff felt intimidated by the signage and into not assisting this neighbor of hers.

255.     Lucero Apartments property maintenance is poor. It is a lease violation for tenants to have dead plants on their patios, yet planters in community areas are not maintained and are full with dead plants. Lighting along the path from the Wilson Street surface lot has been broken practically since Plaintiff's move-in date. Tenant has a hole in her shower lining from poor construction that has led to leaks in the apartment below. It was fixed once, and then reverted back to leaking. Maintenance requests to repair it again in a more substantial fashion went

unheeded by the leasing office. Tenant's unit number went missing several months ago, and has not been replaced. Elevators break regularly. One elevator went broken for about five months.

## APARTMENT RENT CEILINGS ARE AT MARKET RATE

256.    Something just seems amiss when a person is the victim of all the aforementioned rights violations, yet the market value of her 1/1 apartment is over $1,300.00 a month — and in low-income housing.

257.    Lucero Apartments paid $332,097.75 in property taxes for 2017. No exemptions were applied to the property tax bill.

258.    State and federal law appear to only provide a mechanism for property tax exemptions for low-income properties that are owned by charitable organizations, or non-profit organizations with the 501(c)(3) status.

259.    To Plaintiff's knowledge, Property Owner does not possess this status. Plaintiff believes the restriction of government code to permit property tax exemptions for low-income properties only for charitable organizations that own them, is the reason for the lack of Lucero Apartment's property tax exemptions.

260.    Plaintiff avers that Lucero Apartments could qualify for other property tax exemptions, e.g., for Seniors, if it weren't for overly restricted government code.

261.    Plaintiff avers lack of property tax exemptions for Lucero Apartments is creating a situation wherein units at Lucero Apartments are rated above fair market value.

262.    Plaintiff avers it is unreasonable to require all low-income Property Owners and / or property management to engage in the bureaucratic process that comes with being a nonprofit organization, on top of the bureaucratic processes that come from maintaining federal subsidies for properties and tenants.

263.    Plaintiff avers Property Owner would have the financial capacity to maintain maintenance and operations for Lucero Apartments properly and comprehensively, and set a reasonable rent ceiling, if Property Owner had low-income property tax exemptions.

264.    Plaintiff questions the amount of profit made by Property Owner off of Lucero Apartments.

**_A Final Concern Regarding Proposed HUD Regulation Changes_**

265.    Congress recently proposed a bill entitled the _Making Affordable Housing Work Act of 2018_, which would require some HUD-assisted residents to be employed.

266.    The bill also proposes a rent increase, and hardship paperwork requirement.

267.    Because Plaintiff is drinking from the firehose of life, she does not at the present time, have the time, to read the bill in its entirety if she wishes to complete the current complaint in a timely fashion. Thus, there may be other problematic requirements in the proposed bill.

268.    Plaintiff is one of the most employable, educated people in the nation. Plaintiff has a PhD, and postdoctoral training in translational neuroscience and neurobiology from one of the eight original Public Ivy institutions in the United States. She also has graduate training from an internationally competitive science institution hailing over 50 Nobel Laureates.

269.    Plaintiff has always had a beyond strong work ethic, and indeed, she prefers to work. Lack of work causes feelings of social isolation and stress for Plaintiff. Plaintiff's entire life, from age 5-38 years, was structured full time school or work. Therefore, Plaintiff is habitually conditioned for full time structured school or work from her 33-year school and work history. Nevertheless, Plaintiff cannot get a stable job, in which she is treated with dignity and respect, and not subjected to sex discrimination, sexual harassment, or age discrimination.

## V. LEGAL ARGUMENT

## COURT-RELATED DEFENDANTS VIOLATED PLAINTIFF'S RIGHTS AND MADE A MOCKERY OF LEGAL PROCEEDINGS

270.    Plaintiff experienced a pervasive deprivation of her rights during the legal proceedings surrounding her criminal trespass, including her universal right to freedom from degrading treatment, her constitutional right to general welfare, virtually all of her Constitutional Sixth Amendment rights, her Fourteenth Amendment right to equal protection under the law, and her Fifth Amendment right to due process.

271.    Plaintiff experienced ineffective assistance of counsel by virtue of (a) Mr. Burke's apparent and claimed submittal of a motion that was completely to the detriment of Plaintiff's case, and (b) Mr. Burke's overwhelming failure to develop any appropriate, much less the most appropriate defense for Plaintiff, which was patently obvious to Plaintiff, a non-lawyer. If Mr. Burke felt so lacking in expertise in civil law as to not be able to use it as a defense for Plaintiff, then he should have consulted with a civil attorney, just as a criminal lawyer would seek consultation from a scientist were he to use DNA evidence in support of a client's defense.

272.    Mr. Burke failed to assist Plaintiff with her own Pretrial Motion to Dismiss in the most basic way, and failed to use the copious amounts of evidence provided him by Plaintiff both before and after Plaintiff's issuance of said motion.

273.    That Plaintiff was able to get her Community Supervision dismissed after Mr. Burke was removed from her case, and using much of the evidence Plaintiff provided to Mr. Burke while he was representing her, is prima facie evidence of Mr. Burke's ineffective assistance (see **Attachment 2**).

274.    The Travis County Criminal Court's frivolous order of competency evaluation for Plaintiff was degrading, especially in light of Plaintiff possessing a B.A., M.S., and Ph.D. in psychology.

275.    CAPDS is culpable in Plaintiff's receipt of ineffective assistance by virtue of their consistent facilitation of the appointment of incompetent people to her case, including the two attorneys appointed to Plaintiff for her charge (the second attorney not being mentioned in this complaint because he was on the case for a relatively short period of time compared with Mr. Burke), and the incompetence of the evaluating psychologist. Further, CAPSD permitted and and at times their participated in degrading Plaintiff and violating her rights.

276.    CAPDS violated Plaintiff's right to equal protection and general welfare by virtue of forcing Plaintiff to undergo a competency evaluation during the beginning of her menstrual cycle. Wherein there is no rule of law providing an extension for competency evaluations past the 30-day requirement from order for medical reasons, The United States of America is likewise culpable.

277.    The United States of America is culpable for the unnecessarily degrading competency evaluation of Plaintiff wherein there is not rule of law limiting (1) the diagnostic powers of the evaluating psychologist in said forum, (2) the circumstances under which such an evaluation is required, (3) the nature of the evaluation and the minimum necessary relevant criteria for completing a successful competency evaluation, and (4) the amount of time and number of days allowed for competency evaluations.

278.    Plaintiff avers that the administration of the Minnesota Multiphasic Personality Inventory for a competency evaluation is wholly irrelevant for assessing competency. Therefore, its use during a competency evaluation makes a mockery of legal, court-related proceedings.

279.    Travis County Criminal Court permitted violation of Plaintiff's right to speedy trial and neglected to address Plaintiff's coercion statement during the plea bargaining process, thereby violating her Sixth Amendment rights and her Fifth Amendment right to due process.

280.    The Travis County District Attorney's Office abused its office by maintaining their stance on prohibiting Plaintiff from going to The University of Texas at Austin or emailing anybody there, violating Plaintiff's freedoms of movement and association.

**DEFENDANTS' COMBINED UNCONSTITUTIONAL ACTIONS CREATED EMPLOYMENT DURESS FOR PLAINTIFF**

281.    On November 2, 2015, the HUD Office of Public and Indian Housing issued Notice PIH 2015-19, stating the following:

> …arrest records may not be the basis for denying admission, terminating assistance or evicting tenants…and to remind them of their obligation to safeguard the due process rights of applicants and tenants.

282.    The above notice was reified more generally by HUD's promulgation of the *Office of General Counsel Guidance on Application of Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing and Real Estate-Related Transactions* April 4, 2016, just three months prior to Eureka Multifamily's suspension of Plaintiff's eligibility for a public housing unit at Lucero Property Homes based on her open misdemeanor charge, the reversal of which was contingent on resolution of said charge:

> A housing provider with a policy or practice of excluding individuals because of one or more prior arrests (without any conviction) cannot satisfy its burden of showing that such policy or practice is necessary to achieve a substantial, legitimate, nondiscriminatory interest. As the Supreme Court has recognized, '[t]he mere fact that a man has been arrested has very little, if any, probative value in showing that he has engaged in any misconduct. An arrest shows nothing more than that someone probably suspected the person apprehended of an offense." Because arrest records do not constitute proof of past unlawful conduct and are often incomplete (e.g., by failing to indicate whether the individual was

prosecuted, convicted, or acquitted), the fact of an arrest is not a reliable basis upon which to assess the potential risk to resident safety or property posed by a particular individual. For that reason, a housing provider who denies housing to persons on the basis of arrests not resulting in conviction cannot prove that the exclusion actually assists in protecting resident safety and/or property.

283.    Therefore, Eureka Multifamily deprived Plaintiff of her Fifth Amendment right to due process for maintaining public housing occupancy eligibility based on an open arrest charge, which directly induced Plaintiff's employment duress — a violation which continues to adversely affect Plaintiff's ability to work and her financial solvency.

284.    Based on General Counsel's updated April 2016 Guidance, this same action by Eureka Multifamily constituted a violation of Plaintiff's Fourteenth Amendment right to equal protection under the law, by way of illegitimate discrimination based on arrest history.

285.    The same Eureka Multifamily staff member who violated Plaintiff's right to due process, subsequently stated that she had been working in the business of HUD leasing management for ten years. This is much longer than the aforementioned HUD law regarding due process on the basis of arrest records, issued specifically by HUD at least two different times within the last decade. Therefore, Plaintiff avers Eureka Multifamily's illegitimate and discriminatory practice of denying Plaintiff admission on the basis of an open arrest charge was intentional mistreatment by a public servant, the Texas Code for which is cited later in this section.

286.    Eureka Multifamily's illegal action in revoking Plaintiff's occupancy eligibility at Lucero Apartments solely on the basis of an open arrest resulted in coercion of Plaintiff into a plea bargain for a crime she did not commit, and for which she was illegally arrested. This illegal action has resulted in her ongoing employment-related duress.

287.    The probationary term resulting from Mr. Burke's ineffective assistance for Plaintiff, Travis County Criminal Court's rights violations of Plaintiff, and Eureka Multifamily's mistreatment of Plaintiff prevented her hire for at least one job that was accessible to Plaintiff given her travel constraints, and in her general area of specialty (psychology / mental health), further resulting in her limited freedom of movement to comprehensively access potential employment, thereby restricting her freedom to work due to the lack of money that Plaintiff could have otherwise used to purchase reliable transportation.

288.    The probationary term resulting deprivation of Plaintiff's Fifth and Sixth Amendment rights and based on coercive time constraints has similarly resulted in the violation of Plaintiff's universal rights "...to work, to free choice of employment...and to protection against unemployment," by virtue of Article 23 of the United Nations' Universal Declaration of Human Rights, by way of a different and separate incident compared with the misrepresentation of sporadic income as identified above.

289.    Plaintiff applied to several other jobs following her probationary term, for which she was not hired. Because her probationary term still both appears via background check software and is available for viewing by the public, for all practical intents and purposes Plaintiff cannot know what potential employers may or may not have legally or illegally used her background check information to make the decision to not hire Plaintiff.

290.    The State of Texas and Department of Justice are both participants in the violation of both Plaintiff's universal right to work, as well as her Fifth Amendment right to liberty by virtue of the end of sentencing. If the United States and a judge elected to uphold its laws believe a particular result is just, then prolonging adverse effects for Plaintiff or any citizen, imposes on them both a lack of liberty and a lack of due process.

291.   This participation is by virtue of the failure of the State of Texas to compose and enforce proper and swift expunction code in the realm of offenses involving dismissals and deferred adjudication after conditions are met — especially for misdemeanors and non-violent offenses. The best a person can get in Texas after meeting Community Supervision terms is an order of nondisclosure, which still allows many of the potential employers in Plaintiff's field of specialty to view her satisfied charge via background check.

292.   The way Texas expunction code currently reads, an individual completing a jail term for a violent felony has more and swifter expunction rights than Plaintiff serving a probationary term for criminal trespass misdemeanor. Even if Plaintiff's arrest was legal, which it was not, this is a clear violation of due process under the law.

293.   The Department of Justice is similarly culpable because these freedoms should not vary by state, therefore, federal rule should comprehensively legislate swift expunction code.

294.   In preparing this complaint and going back through the paperwork, Plaintiff notes that her Community Supervision early release form indicates a change to dismissal, making her possibly eligible for expunction (see **Attachment 2**). Although, it is unclear whether there is a special dismissal category for probationary terms that only allow for an orders of nondisclosures, and not for expunctions. In the event this is the case, Plaintiff avers such a type of legislation would not pass the laugh test. Plaintiff's ongoing sleep deprivation and torment at Lucero Apartments has interfered with her ability to remember this fact and take appropriate action; furthermore, she cannot afford an attorney.

295.   The dismissal of Plaintiff's is not reflected in the Travis County on-line misdemeanor search where. The Community Supervision term that was initially slated for one year on July 20, 2016. The case status was commuted to a dismissal on January 20, 2017. Still as of July 5, 2018,

Travis County's on-line misdemeanor search displays Plaintiff's charge status as "Comp Probation", which as far as Plaintiff can tell, indicates "Completed Probation".

296.    Eureka Multifamily's misrepresentation of HUD regulation for sporadic income by their staff member with ten years of experience in HUD regulation violated Plaintiff's universal rights "…to work, to free choice of employment…and to protection against unemployment," by virtue of Article 23 of the United Nations' Universal Declaration of Human Rights. Specifically, Eureka Multifamily's unnecessary prying into Plaintiff's sporadic income from babysitting during her sign-on directly resulted in the termination of said income.

297.    Dominium Management failed to hire Plaintiff, despite her having both far and away a much higher level of education, more experience working in government, and in hindsight clearly quite a bit more knowledge about human and civil rights code directly involving HUD financially assisted residents than the people actually hired to do the job. This constitutes a violation of Plaintiff's Fourteenth Amendment right to equal protection, and her universal right to work.

298.    Taken together, these right to work violations have cumulative, interacting, and compounding adverse effects on Plaintiff's general liberties.

## LACK OF TRANQUILITY ON PUBLIC HOUSING PREMISES IS A FAR-REACHING PUBLIC HEALTH AND SOCIAL JUSTICE ISSUE

299.    Domestic tranquility and promotion of general welfare in subsidized housing is an equal protection issue based on race. Forty-eight percent of residents in subsidized housing in the United States are black, whereas only 12% of the nation's citizens are black.

300.   Domestic tranquility and promotion of general welfare in subsidized housing is also an equal protection issue based on sex. Seventy-five percent of subsidized housing in the United States is occupied by women, whereas only 50% of the nation's citizens are women.

***Lack of Provision of Comprehensive Safety and Security Measures is a Violation of HUD Residents' Constitutional Right to Domestic Tranquility and General Welfare***

301.   Many if not all HUD multifamily properties put people with disabilities at the top of the waiting list for occupancy. This includes mental disabilities, which can and often include disabilities that adversely impact residents' impulse control, social wellbeing, social interaction capabilities, and cognition, some of which manifest in an increased likelihood of aggression.

302.   Furthermore, and perhaps most importantly, it is empirically demonstrated that poverty itself impacts both directly and indirectly on mental illness (Hudson, CG, 2005. Socioeconomic status and mental illness: Tests of the social causation and selection hypotheses, *American Journal of Orthopsychiatry*, 75: 3-18). That is, structural equation modeling in this primary source scientific article shows the directionality of poverty increasing risk for mental illness, rather than mental illness increasing poverty risk. That is, the experience of poverty itself increases mental illness risk, rather than the experience of mental illness causing poverty.

303.   Living in an urban impoverished environment dramatically increases Post-Traumatic Stress Disorder (PTSD) among individuals, which is shown to go vastly undiagnosed in these residents. Whereas the national rate of PTSD is at or around 6.8%, undiagnosed PTSD for residents in urban impoverished environments is shown to reach 43% [Schwartz, et al., 2005. Post-traumatic stress disorder among african americans in an inner city mental health clinic. *Psychiatric Services*, 56(2): 212-215].

304.    The increased prevalence of PTSD for residents living in urban impoverished environments is demonstrated to be a function of the environment, and not of race [Parto, et al., 2011. Symptoms of Post-traumatic Stress Disorder among urban residents. *Journal of Nervous Mental Disorders*, 199(7): 436-439].

305.    It is not difficult to arrive at the conclusion, and given a little bit of consideration (or conversation with such a resident), it is common sense that the experience of poverty will adversely impact a person's daily life in myriad, chronic ways, especially by virtue of low internal and high external locus of control, thereby increasing residents' risk of anxiety, depression, and PTSD. As such, even people living in subsidized housing and receiving financial assistance without official mental health diagnoses, are very likely suffering from some type of mental illness, making subsidized residents a vulnerable population.

306.    HUD has failed to ensure domestic tranquility, promote the general welfare, and provide due process rights for the vulnerable residents of HUD facilities by failing to put in place an added level of required, 24-hour, on-site presence of an officer of the peace with psychological training per capita, whose job it is to manage potential conflicts in a manner that serves the needs of all people on the property, with clear plans of action for permanent solutions and enforcement for problems that minimize harm and maximize occupancy retention for all residents — including those initiating conflict.

307.    HUD has also violated the general welfare of public housing residents at Lucero Apartments by increasing their likelihood of exposure to vehicle exhaust. Here, HUD failed to provide adequate legislation for considering neighborhood placement of multifamily housing in the context of available municipal and other necessary facilities and resources, and for

implementing maximum safety measures for residents' travel to said destinations, as well as optimizing contribution of subsidies to the surrounding neighborhood.

308.    Specifically, there is a large municipal park one block south of Lucero Apartments. Just south of and adjacent to the park is a comprehensive facility established and run by the City of Austin and Travis County called the South Austin Neighborhood Center (SANC), which provides indigent medical care including dental; social services including provision of pantry services and produce to women, infants, children, and the elderly; free bus passes; a senior activity center; career services; and a computer facility.

309.    To access the park and community center, residents of Lucero Apartments must cross a busy and exhaust-filled street with no crosswalk — or, walk to a nearby intersection where the exhaust is exponentially increased, given that it is the intersection of two of the most busy, four-lane urban streets in Austin.

310.    Exhaust and traffic are both important health-related concerns. It is empirically shown that exhaust can contribute to Attention-Deficit Hyperactivity Disorder, autism, and Alzheimer's Disease, just to name a few.

311.    HUD building regulation failed to put in comprehensive neighborhood evaluation measures that could have resulted in a solid, lighted crosswalk with arms installed at this intersection, along with contributions to the park such as the Splash Pad. This would have provided a resource to all the surrounding neighborhood residents, encouraging integration and reducing noise by way of the open space of the park and its grassy (rather than concrete) surround, and diluting utilities expenses of running the splash pad among all City taxpayers.

312.    Plaintiff is unsure of the origins of funds for building the property and seeks discovery therefor. Nevertheless, the City of Austin is in part culpable in neglecting to consider

the neighborhood surround and how Lucero Apartments residents would be most benefited by way of lights, crosswalks, and Lucero Apartments accessibility.

313.    This failure also reduces residents' likelihood of engaging in exercise for travel, and for those who dare to do so anyway or have no other choice, increases their exposure to harmful exhaust. These health-related issues are still other ways that HUD and the City of Austin failed to protect the general welfare for Lucero Apartment residents, as well as neighbors living adjacent to the property and park.

314.    The State of Texas, HUD, and the City of Austin failed to put in place adequate physical security and safety laws, including building codes involving good securing of the perimeter, for protecting residents of multifamily housing and their belongings on the entire multifamily premises, which is especially important for impoverished and therefore vulnerable people, thereby infringing on HUD residents' aforementioned constitutional rights to domestic tranquility and general welfare. This could include tougher laws about key access by maintenance, as well as changed locks upon new resident occupancy for multifamily housing.

315.    Together, because of the fears bestowed upon Plaintiff involving lack of safety and security, the threats, assault, and theft incidents have rendered Plaintiff afraid to leave her apartment, thereby violating her constitutional right to freedom of movement.

*__Community Noise is a Violation of HUD Residents' Constitutional Right to Domestic Tranquility and General Welfare__*

316.    Lack of domestic tranquility by way of community noise results in empirically validated learning and cognition problems, as identified in the World Health Organization's (WHO) *Guidelines for Community Noise* — in particular, in Section 3, "Adverse Health Effects of Noise."

317.    Groups of people identified as particularly sensitive to the adverse effects of community noise include the elderly and children, which characterize a great number of residents at Lucero Apartments — especially given the fact that individuals over 62 years of age are put at the top of the waiting list for Lucero Apartments occupancy. When community noise contributes to chronic sleep deprivation, the adverse health effects are magnified many fold.

318.    Whereas community noise negatively impacts healthy people, it also exacerbates mental illness. Because people living in government-assisted housing have heightened vulnerability to mental illness due to the adverse impacts of poverty itself, this group of individuals falls in the sensitive category for community noise exposure by default.

319.    Given these facts, and that much of the noise generated is out of residents' control, unpredictable, and low-frequency (all factors also cited as particularly detrimental characteristics for human health in the WHO community noise report), permitting unrelenting and ongoing community noise in HUD housing can be construed as proactively setting up an environment that is likely to engender assault, and / or passively permitting assault to occur.

320.    HUD has failed to put in place adequate design measures to ensure the upholding of all residents' constitutional right to domestic tranquility by way of community noise minimization for residents living in *all* multifamily housing, not just those who are impoverished. As noted above, however, public housing residents are particularly vulnerable to community noise.

321.    HUD's failures include the failure to require building a community center between residential and recreational that serves as a noise buffer by way of both barrier and increased distance; failure to ensure enough surrounding open space for outdoor recreational areas to allow noise to dissipate; failure to legislatively prevent the creation of concrete echo chambers around

play areas that adjoin residential space; failure to require design of exterior walls that maximize acoustic dampening and minimize sound travel; failure to require acoustical design of patio overhangs that minimize bouncing of outdoor sound waves into residences; and failure to require installation of American Society for Testing and Materials Impact Isolation Class / Sound Transmission Class (IIC-STC) 70 rating for flooring underlayment, which makes floors virtually sound-proof, underneath all floors in multifamily housing — and especially in subsidized multifamily housing, wherein residents are by default more vulnerable to the adverse impacts of community noise compared with the general population.

322.    HUD and other defendants are similarly culpable for failing to implement legislation for, and failing to provide reasonable schedules and notifications for maintenance-related community noise well in advance of the maintenance-related noise. Lack of establishment rules regarding consolidation of noisy maintenance and apartment intrusions, and for communication to residents about a reasonably intermittent landscaping and pressure washing plan from Lucero Apartments property management contributes to a lack of domestic tranquility and, with other unrelenting noise, including but not limited to poor maintenance checks for complex-wide fire alarm functionality, frequent amplified bass, extremely loud noise from children, and nighttime and daytime impact noise due to inadequate flooring insulation from inescapable tormenting neighbors, can cause Chronic Mild Stress (CMS) for residents.

323.    There are more than 1,300 scientific papers published on CMS over the last 30 years, and it is empirically shown to induce cognitive and emotional problems, such as social cognition, cognitive flexibility, anxiety, learned helplessness and depression [Willner, P, 2017. The chronic mild stress (CMS) model of depression: History, evaluation, and usage. *Neurobiology of Stress*, 6: 78-93]. Thus, in addition to serving as a violation of domestic tranquility, it is also a violation

of residents' constitutional right to general welfare, as well as equal protection under the law compared with people who own their residences and therefore have control over when their noisy maintenance occurs.

324.    The willfully negligent permittance of CMS by Defendants is a violation of equal protection for cycling females living in public housing. Because the neurotransmitters implicated in CMS protection from and habituation to chronic stressors fluctuate on a monthly basis for cycling females, cycling females are very likely more susceptible to the effects of CMS and indeed, Major Depression is shown to be more prevalent in women. Because the proportion of women living in public housing is so much greater than that of the general population, the impact of this lack of equal protection is societally and numerically relevant.

325.    The current fire safety inspection regime and failure to provide comprehensive related maintenance is a conglomerate subpart of the overall CMS imposed upon Plaintiff and residents by Lucero Apartments. Further, it poses threats to residents' aural and mental health that likely far exceed the risk of loss or injury from fire. By WHO standards, this is a protocol that will ensure permanent hearing loss — for a fire that may or may not ever even happen.

## LEGAL RAMIFICATIONS OF UTILITIES, MAINTENANCE, AND AMENITIES MISMANAGEMENT AT LUCERO APARTMENT HOMES

326.    Article 5 of *The Universal Declaration of Human Rights* promulgated by the United Nations asserts the following: "No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment."

327.    Dominium Management violated Plaintiff's right to domestic tranquility and universal right to freedom from degrading treatment by requesting Plaintiff pay an unmetered water bill every month. Not all residents were asked to do so, did not pay for water for the

duration of a lack of metering, and received no penalty for lack of payment. Plaintiff was punished and tormented for being proactive and diligent, and her right to domestic tranquility was violated for eight months by virtue of the specter of losing occupancy of her unit if she did not keep current with unreasonable water bill costs.

328.    Lucero Apartments and / or HUD have violated Plaintiff's domestic tranquility and right to lack of overwhelming paperwork burden by initiating annual decreases for utility allowances. This also contributes to the overall overwhelming paperwork burden.

329.    It is important to note that, prior to the building of Lucero Apartments, residents living in HUD-assisted multifamily units on the same property were not required to pay for any utilities at times. Constantly shifting the nature of how utilities are financially addressed for residents adds yet another unpredictable stressor, further violating residents' constitutional rights to domestic tranquility and general welfare. Really, it would be less stressful to keep utility allowances lower, yet unchanging.

330.    However, keeping utility allowances lower is a violation of equal protection for low-income residents, including Plaintiff.

### *Utility Allowance, Internet Provisions, and Lack of Equal Protection*

331.    HUD regulation stipulates that utility allowance usage is only for water and electricity by virtue of dated HUD code. That is, the utility allowance is not provided for internet or phone expenses.

332.    Yet without the financial ability to own a car, Plaintiff became reliant on internet and phone usage for submitting job applications, engaging in job interviews, paying bills, conducting business with the goal of lowering living costs, and staying connected with family, friends, and

colleagues. Thus, the current utility allowance regime contributes to Plaintiff's financial duress and threats to her freedom of cybermovement.

333.     Indigent services that are in place in principle for internet and phone expenses have proven to be either overly restrictive or defunct in practice for Plaintiff (i.e., Lifeline of Texas, which is a program Plaintiff attempted to use yet it was either overly restrictive or defunct, and communication for receiving services was abysmal; the State of Texas assistance with internet service was not available when Plaintiff sought said service). The need to learn about and apply for such services is another addition to paperwork burden.

334.     In the instance wherein Plaintiff's utility allowance slightly exceeds the amount of her water and electric bills, Plaintiff still has necessary utilities that together always exceed the utility allowance amount.

335.     Here, HUD has failed to implement code of federal regulation that together both minimizes costs to residents for vital services that assist them both in maintaining their current housing and attempting to become fiscally solvent and thereby independent from the need for public assistance.

336.     Lack of said HUD CFR implementation regarding utility allowance changes also fails to protect public housing residents from stressful periodic changes in the nature of the administration of these costs.

337.     To add to these stressors, the number of internet providers at Lucero Apartments is abysmal, and costs for the same internet service (50 Mbps down max) keep increasing across time, which is in conflict with the principles of supply and demand in a free market where there are competitive forces.

338.    Some internet providers not currently providing services at Lucero Apartments are forcing higher minimum speeds and charging less overall for these speeds, yet total cost is often more important than relative fee for service, for the impoverished. That is, it is great that Google Fiber is providing 100 Mbps down for $50 a month to the general population, but Plaintiff doesn't need that speed, Google Fiber provides no lower-tier option, and Plaintiff is paying almost $50 a month for the copper wire service that *is* currently provided at Lucero Apartments, at 50 Mbps down — despite fiber optic capabilities in her apartment sitting unused.

339.    This is in the context of an initiative by the Obama administration to uphold equal protection of HUD residents in the realm of high-speed internet access in 2015. The intention of the Obama Administration was to provide this infrastructure with the goal of increasing market pressure.

340.    However, even with the two copper wire companies available and providing internet services — Time Warner Cable and Grande Communications — it appears they have a deal agreement to stay at the same level of cost for service — approaching $50 a month for 50 Mbps down, thereby circumventing their participation in market competition. Grande lists their costs lower, but the monthly charge includes required rental of a modem, which is not mentioned in the total advertised monthly price.

341.    Given that Lucero Apartments is completely outfitted for fiber optic, Google Fiber's refusal to Plaintiff via email to provide affordable internet and suggestion that they may provide 100 Mbps at their general public rate at Lucero Apartments, could be construed as fraud in spirit with regard to the intention of the previous administration's legislation.

342.    This is especially in light of the fact that Google Fiber would not need to outfit each apartment for receiving fiber optic if they began providing services to Lucero Apartments. Plaintiff avers it might be good to add Google Fiber as a Defendant in the complaint.

343.    One other currently available option at Lucero Apartments and through PCs for People is use of a wifi hotspot, which has max speeds of 150 Mbps down and, if a Lucero resident has the money up front of about $300, can pay only $20 a month for this internet service. However, wifi hotspots are notoriously hackable, and the available wifi hotspot produces a high electromagnetic field at close range.

344.    Plaintiff avers she deserves to have a cost-effective choice that does not involve use of a wifi hotspot, and, given the financial duress of residents at Lucero Apartments, this forced choice strong-arms impoverished families into using internet services lacking in safety and security.

345.    This constitutes a lack of equal protection and obstacles to freedom of cybermovement for vulnerable public housing residents in the realm of internet services provision. Plaintiff avers this permissive allowance of lack of competition may be a legal problem affecting all U.S. citizens living in urban environments and as such avers it may be necessary to add the Federal Communications Commission and / or the Federal Trade Commission as Defendants in this complaint to ensure appropriate competition among multiple internet companies, thereby making way for the upholding of U.S. citizens' right to freedom of movement via the internet. Additional fiscal protections must be provided to vulnerable, impoverished public housing residents.

346.    Even for people who do not work, phone and internet utilities are extremely important for the impoverished, and Plaintiff avers even more so for the elderly and disabled, to get social and other needs (e.g., paperwork demands, banking, bill paying, purchases, etc.) met.

347.    Clearly as time passes, this will become an increasingly relevant issue, given that in 20 years or less, almost all elderly people will be internet proficient and probably also reliant. Failure to provide adequate, competitive and affordable high-speed internet choices for residents in subsidized multifamily housing, and to include high-speed internet in the scope of utilities for utility allowances, is a failure of HUD to see to fruition said plans put in place by the previous administration and a failure to provide equal protection to low-income residents in the realm of emerging technological needs and trends of the general population.

*Maintenance*

348.    How and whether there is maintenance available is constantly shifting, and when it changes there is no communication to residents about policy or access for maintenance or after-hours maintenance. The same holds for accessibility of on-site amenities (e.g., computer room with printers).

349.    This constitutes a violation of tenants' universal right to freedom from degrading treatment and right to due process.

350.    HUD is in part culpable for Lucero Apartments managements' failure to provide updated information about available maintenance during off hours, as well as amenities provided on site. HUD's culpability is due to both its lack of stated comprehensive rule or regulation involving maintenance and accessibility of amenities, as well as the overwhelming paperwork burdens current HUD regulations place on HUD designees for administrating subsidies for

residents of low-income multifamily housing — thereby preventing said designees from having the time to focus on property management and related communications to tenants.

***Trash and Recycling***

351.    The failure of The City of Austin to provide waste services to multifamily properties is a violation of equal protection from biohazard to multifamily residents, which make up a very large percentage of the Austin population. It also opens up a loophole for price-gouging the more economically disadvantaged people living in the city.

352.    The failure of The City of Austin to implement comprehensive recycling programs with requirements of volume per capita, clear signage, and enforcement on multifamily properties is a lack of due process for City of Austin residents in seeing to fruition The City of Austin's own Zero-Waste initiative, which if acted upon would benefit all residents of Austin by way of long-term economic stimulus, reduced abuse of limited resources, and increased human and ecological health and sustainability.

353.    The failure of the Environmental Protection Agency to propose and put in place specific and comprehensive code of federal regulation in the realm of recycling and sustainability, beyond recommendations and assistance with strategic practices for local governments, renders recycling a back-burner issue for most municipalities in practice, and constitutes a violation of the constitutional right to general welfare for citizens of the nation.

## LEGAL RAMIFICATIONS OF OTHER HARASSING, ILLEGAL, AND DEGRADING TREATMENT FROM LEASING OFFICE MANAGEMENT

354.    Providing Plaintiff less than a month's worth of opportunity to occupy a unit for which she was eligible is unreasonable and degrading, thereby violating her universal human right. Eureka Multifamily, Property Owner, and HUD are all culpable in either proactively

allowing this unreasonable time constraint, or by passively allowing such an unreasonable demand to be placed on applicants.

355. Leasing office management staff administering HUD financial assistance for residents in multifamily properties are designees of HUD to administer its subsidies. Therefore, said leasing office management staff are public servants in this capacity, including the two management companies and Property Owner listed as Defendants mentioned in this complaint.

356. It is a criminal violation of Texas Penal Code § 39.02, for a public servant to, "…with the intent to harm or defraud another…intentionally or knowingly…violate a law relating to the public servant's office or employment."

357. Furthermore, it is a criminal violation of Texas Penal Code § 39.03, for a public servant, to, when

"…acting under color of his office or employment…intentionally subject another to mistreatment…or…dispossession…that he knows is unlawful; [or] intentionally deny or impede another in the exercise or enjoyment of any right, privilege, power, or immunity…"

358. Here, leasing office staff for Lucero Apartments have continually violated Plaintiff's rights under the auspices of their public servant duties, especially in light of the attitude with which said violations were conducted.

359. Eureka Multifamily misrepresented HUD regulation to Plaintiff during her initial sign-on process for occupancy, causing Plaintiff enormous undue stress, while she already experiencing overwhelming psychological stress by virtue of her semi-homelessness, about which Eureka Multifamily was aware.

360. Eureka Multifamily's misrepresentation of HUD regulation for sporadic income by their staff member with ten years of experience in HUD regulation violated Plaintiff's universal

rights "...to work, to free choice of employment...and to protection against unemployment," by virtue of Article 23 of the United Nations' Universal Declaration of Human Rights. Specifically, Eureka Multifamily's unnecessary prying into Plaintiff's sporadic income from babysitting directly resulted in the termination of said income.

361.   Eureka Multifamily violated 5 CFR Part 1320 with respect to Plaintiff, the purpose of which is to:

> "...implement the provisions of the Paperwork Reduction Act of 1995 (44 U.S.C. chapter 35) (the Act) concerning collections of information...[and]...designed to minimize and control burdens and maximize the practical utility and public benefit of the collection of information by or for Federal agencies from individuals..."

by way of requesting three applications for initial occupancy, including making an unnecessary application update request due to the very change in sporadic income (i.e., the loss of her well-paying sporadic babysitting gig at $25 an hour) they directly caused.

362.   Eureka Multifamily violated HUD law for calculating rent with respect to Plaintiff's job at Vinaigrette Austin, overcharging Plaintiff. Given her extreme poverty, if Eureka Multifamily is to err in the amount charged for rent, the error should benefit Plaintiff and not Lucero Apartments or HUD. In this light, Eureka Multifamily should have charged Plaintiff for the minimum hours per week predicted by Plaintiff's employer in the range Plaintiff would be working, not the maximum, given her destitute and carless status, as well as the meager salary and truncated number of hours worked, not to mention her debt.

363.   Eureka Multifamily's willful neglect in failing to address the elevator problem put more paperwork burden and psychological stress on Plaintiff, constituting mistreatment.

364.   Eureka Multifamily subjected Plaintiff to mistreatment on or around October 3, 2016 by intentionally failing to make plans to move the resident living above Plaintiff who subjected

Plaintiff to daily and unrelenting torment, when they had the opportunity, and further by interpersonally denying her right to domestic tranquility. Clearly this mistreatment of Plaintiff was a consistent and unrelenting pattern by Eureka Multifamily.

365.   Plaintiff avers HUD is in part culpable for these problems given that to Plaintiff's knowledge, the only conditions in which residents supported by HUD programs in multifamily housing are permitted to move are when there is a need for accommodation of disability, or there is a change in family size. That is, HUD has willfully neglected to write in regulations for such properties that facilitate residents' due process for having their right to domestic tranquility upheld — including but not limited to infrastructural modifications (e.g., installation of IIC-STC 70 silent step flooring underlayment upon request of a resident living below a noisy apartment) and requests to move.

366.   Plaintiff's mistreatment by Eureka Multifamily applies in kind to the incident around the same time involving Plaintiff's victimization of disorderly conduct by a juvenile, and Eureka Multifamily's degrading treatment of Plaintiff for having taken a picture of said juvenile and sent to Eureka Multifamily for purposes of identification and enforcement — constituting public servant mistreatment *and* lack of due process *and* a violation of her universal human right.

367.   Plaintiff avers HUD is likewise in part culpable for the mistreatment incurred by Plaintiff , via any and all staff acting in their public capacity in relation to Lucero Apartments, both preceding and following this paragraph. HUD's culpability lies in its lack of stated regulation and / or comprehensive training for proper and dignified treatment of HUD-assisted residents in multifamily housing.

368.   Plaintiff requests that, wherein culpability is in question, Defendants provide evidence in the process of discovery for either (a) lack of HUD regulation requiring dignified

treatment of HUD multifamily residents and appropriate required continuing education units for these public servants; or, (b) presence thereof, thereby rendering Eureka Multifamily and Dominium Management knowing, aware, and therefore having acted intentionally and thereby culpable.

369.   Although, Plaintiff avers that the overwhelming paperwork burden imposed on HUD multifamily property management staff administering subsidies in part engenders deadline stress on property managers, and as such some of the relief sought should relieve property managers from this stress, thereby hopefully improving their demeanor with tenants.

370.   Plaintiff avers that in the context of a program for housing assistance in which a utility allowance is provided for impoverished individuals to ensure their ability to maintain occupancy of their HUD-assisted multifamily dwelling, attempting to charge Plaintiff $100 to move a couch to a dumpster was an attempt at fraud by public servants pursuant to Texas Penal Code Abuse of Official Capacity § 39.02, as well as degrading treatment, especially in light of their having directly created and maintained Plaintiff's impoverished status.  Too, because of Plaintiff's need to involve and communicate with The City of Austin's Code Enforcement department, it adds to Plaintiff's already overwhelming paperwork burden from Lucero Apartments agents.

371.   Plaintiff avers that HUD is in part culpable for the immediately aforementioned fraudulent mistreatment. It is important to consider this attempted action in the context of a large housing complex wherein people with disabilities and the elderly are put to the top of the waiting list. It is empirically shown that people with disabilities and the elderly are lonelier with fewer friends, and by virtue of common sense, the elderly cohort is less likely to be able-bodied for personal assistance with such matters from friends. Therefore, HUD has failed to

comprehensively assist and equally protect this vulnerable population of impoverished individuals by not providing regulation that prevents loopholes for multifamily facilities receiving financial assistance from HUD, to take financial advantage of impoverished HUD residents by way of additional fees.

372.    Lucero Apartment management's failure to provide the EIV Brochure or Appendix 7 of *HUD Handbook 4350.3: Occupancy Requirements of Subsidized Multifamily Housing Programs* to Plaintiff upon first notice of annual recertification, or when initiating interim recertification, is public servant mistreatment of Plaintiff. Although the documents were initially provided to Plaintiff upon sign-on for taking up occupancy, they were only provided to Plaintiff after completion of the initial certification process.

373.    Whereas Plaintiff had these documents in her possession for annual and interim recertifications, they were among 115 lease pages and addenda Plaintiff received for her initial sign-on, with multiple documents unstapled or not relevant / required (e.g., a 7 pp. lead — as in the metal — addendum, for a property built in the 21st century), constituting mistreatment in part due to overwhelming paperwork burden.

374.    HUD is in part culpable for the immediately aforementioned mistreatment of Plaintiff by (a) not providing a requirement for unequivocally clear and concise financial terms for move-in prior to being inducted into the initial certification process; and (b) not requiring that these documents be provided *upon initiation of* (rather than at the conclusion of) interim and annual recertification.

375.    Plaintiff's persistent experience of lack of compliance with basic regulation by the unrelentingly rude and hostile Lucero Apartments management, i.e., people who have power over her domicile, is very stressful and a violation of her constitutional right to domestic

tranquility — and again, mistreatment by public servants by way of the aforementioned Texas Penal Code. This includes but is not limited to mistreatment and misrepresentation of HUD regulation during interim recertifications; consistent promulgation of annual recertification notices with no current or valid OMB number on them; government documents with white-out on them, which is against governmental regulation; statements that sporadic income is included as annual income; and annual notices of utility allowance decreases.

376.    Eureka Multifamily staff engaged in Official Oppression pursuant to the aforementioned code § 39.03 by way of subjecting Plaintiff to mistreatment, and also retaliated against her when she politely asked for help in determining how to best report her Barista interim recertification change by refusing to help her, which is a violation pursuant to Texas Property Code § 92.331.

377.    Instead of assuming Plaintiff's Barista job would turn into a management position, Eureka Multifamily should have asked Plaintiff to work with the employer to establish a committed characterization of work (temporary or permanent) at the time. The employment should have been treated as temporary employment, because that is what it was — and Plaintiff should not have been required to report it as an interim change in income. This constitutes yet another instance of fraudulent Abuse of Official Capacity by public servants pursuant to Texas Penal Code § 39.02. It also constitutes degrading treatment, and is therefore a violation of Plaintiff's universal human right.

378.    Here, there is a loophole in the exact interpretation of HUD law for requesting assistance with paperwork, making HUD in part culpable for the immediately aforementioned violations involving Plaintiff's Barista. Specifically, tenants' rights are stipulated in the *HUD Handbook 4350.3: Occupancy Requirements of Subsidized Multifamily Housing Programs Rev. 4*

in requesting a meeting to "...discuss any change in rent or assistance payment resulting from the recertification processing." This regulation only obligates the designee to meet and discuss "...how the Tenant's rent and assistance payment, if any, were computed."

379.    In effect, the past-tense phrasing allows HUD designees to work with tenants on recertification paperwork only after the fact. This loophole imposes an undue paperwork burden on residents, and in practice puts in place an obstacle to prevent tenants from experiencing incorrect and potentially devastatingly costly rent increases from the designee, and rather requiring tenants to redress surprise discrepancies, misinterpretations due to lack of comprehensive paperwork, and poor communication, after the fact. Therefore, this loophole provides a mechanism for violating tenants' constitutional right to domestic tranquility, which was manifest here for Plaintiff.

380.    On April 19, 2018, Dominium Management violated Plaintiff's right to summon police or emergency assistance, pursuant to § 92.015 of Texas Property Code, by threatening to revoke her participation in Section 8 if Plaintiff calls the police regarding the illegal behavior of any resident on Lucero Apartments grounds. This constitutes yet another instance of violation of Texas Penal Code involving Abuse of Official Capacity § 39.03, by virtue of their role as public servants in the mistreatment of Plaintiff.

381.    It also constitutes Landlord retaliation against Plaintiff by virtue of Texas Property Code § 92.331(b)(5) by their "...engaging, in bad faith, in a course of conduct that materially interferes with the tenant's rights under the tenant's lease". Given the requirement of their training and the fact that they are landlording in Texas, "they didn't know" they were violating landlord law is not an acceptable answer.

382.   Any attempt to suggest that because Plaintiff's right pursuant to § 92.015 is not a tenant right explicitly stated on the tenant's lease would be a bad faith misrepresentation of the spirit of the law.

383.   The consistent lack of Lucero Apartments management compliance with basic regulation  from both Eureka Multifamily and Dominium Management is intimidating and stressful, i.e., Plaintiff never knows what law or regulation Lucero Apartments management may capriciously violate next, thereby resulting in Plaintiff having chronic generalized stress over whether she will be evicted from her apartment at any moment; i.e., violation of her constitutional right to domestic tranquility.

384.   The receipt of an annual recertification letter without any mention of an OMB number, under the auspices of continual Texas public servant Abuse of Official Capacity violations, is yet another violation of Plaintiff's constitutional right to domestic tranquility, as well as her right to freedom from overwhelming paperwork burden.

385.   The May 2, 2018 letter is yet another case in point of this persistent misrepresentation of code, constituting yet another set of violations of Texas Penal Code viz a viz public servant Abuse of Official Capacity, by way of maltreatment of Plaintiff, as well as retaliation by virtue of Plaintiff asserting her HUD-based financial rights, and in response "...engaging, in bad faith, in a course of conduct that materially interferes with the tenant's rights under the tenant's lease (Texas Property Code § 92.331)." It also violated Plaintiff's right to not be mistreated, and her right to maintain domestic tranquility on Lucero Apartments property and with regards to continuing occupancy at Lucero Apartments. These offenses apply to the misrepresentation of HUD regulations listed below.

386.    Appendix 7 of *HUD Handbook 4350.3: Occupancy Requirements of Subsidized Multifamily Housing Programs Rev. 4* (hereafter, "Appendix 7") lists under the heading "Exclusions from Annual Income", "Temporary, nonrecurring or sporadic income." In contrast, the May 2, 2018 letter from Dominium Management states: "As to your income, HUD <u>does</u> count 'sporadic income'…"

387.    Furthermore, the May 2, 2018 letter from Dominium Management states, "…we do <u>not</u> figure your income based off your bank accounts." By contrast, Appendix 7 (see **Attachment 14**) states "When determining the amount of income from assets to be included in annual income, <u>the actual income derived from the assets is included</u>…". Under the heading "Assets Include:", the following is listed: "<u>Cash held in savings and checking accounts</u>, safe deposit boxes, homes, etc." Therefore, the May 2, 2018 email misrepresents this second HUD regulation to Plaintiff within the same letter.

388.    Finally, The May 2, 2018 letter from Dominium Management states, "If you received over $200 and did not report it, this is a violation and you will have to repay HUD." By contrast, Appendix 7 states the Owner or Agent's responsibilities include, to "recalculate rent when resident income increases by $200 or more <u>per month</u>."

389.    The omission of the phrase "per month" and failure to mention exempt types of income when referring to income increases by $200 or more by Dominium Management in their May 2, 2018 letter, misrepresents HUD regulation to Plaintiff, which is stressful, given that Plaintiff received multiple types of exempt income in lump sums over $200 in the last six consecutive bank statements for her 2018 annual recertification, including an inheritance check, a delayed leave payout from a publicly assisted higher education training program, and income for her temporary work with Travis County Elections.

390.    Therefore, the May 2, 2018 email misrepresents this third HUD regulation to Plaintiff within the same letter, contributing to Plaintiff's chronic psychological stress, and constituting multiple abuse of official capacity and domestic tranquility violations.

391.    Plaintiff avers that the current income reporting HUD rules violate the spirit of 5 CFR Part 1320 "Controlling Paperwork Burdens on the Public", and are unclear and designed in such a way as to maintain low-income residents' impoverished status.

392.    Lack of an email address via which to resolve these problems, and failure of an agency to proactively assist an individual with problems by not forwarding the individual's email to the appropriate contact, is a violation of Plaintiff's due process and freedom from paperwork burden by virtue of lack of a paper trail, and also by failure to use information technology to the maximum extent possible.

393.    Wherein this latter information technology rule may only apply in the governmental seeking of information, it needs to be broadened to include bidirectional communications, including but not limited to individuals' seeking of government information and assistance, and seeking to redress complaints, to afford reasonable, due process measures lacking in burden. Also, individuals working in an overly burdensome governmental bureaucracy need to be proactive to the maximum extent possible in connecting complainants and information seekers with a person in the appropriate office for the complaint and with the correct information and proper authority.

394.    Unnecessary duplication in the *HUD Handbook 4350.3: Occupancy Requirements of Subsidized Multifamily Housing Programs Rev. 4* constitutes overwhelming and unnecessary paperwork burden for public housing leasing office designees as well as tenants.

395.   Dominium Management staffs' behavior during their mutually agreed upon May 8, 2018 annual recertification meeting with Plaintiff was retaliatory toward Plaintiff based on previously cited Texas Property Code. This is especially in light of Plaintiff's previous and explicit written request that staff communicate with Plaintiff ahead of time to ensure that they had in their possession all necessary documentation, thereby minimizing Plaintiff's paperwork burden and thereby her paperwork-related visits to the leasing office for annual recertification purposes.

396.   Dominium Management staff's claim of violation of Fair Housing for other residents if they print out Plaintiff's paperwork, in principle actually applies to violation of Plaintiff's right to freedom from overwhelming paperwork burden.

397.   Specifically, many Lucero residents are on fixed income and as such receive one letter in the mail confirming disability or social security benefit, which residents can take to leasing office staff with ease to be copied. Others working regular jobs have a comparatively small amount of documentation to provide.

398.   By contrast, Plaintiff avers that her numerous instances of exempt income, as well as multiple unusual circumstances surrounding it, resulted in a paperwork burden far and away more involved than for the average resident at Lucero Apartments.

399.   As such, Plaintiff avers she was the victim of retaliation, by virtue of Dominium Management's refusal to process Plaintiff's annual recertification with all documentation reasonably accessible to both them and HUD electronically, even *after* Plaintiff asserted her right to freedom from overwhelming paperwork burden. The code applicable to this matter is 5 CFR § 1320.9:

"As part of the agency submission to OMB of a proposed collection of information, the agency (through…their designee) shall certify…that the proposed collection of information…(b) Is not unnecessarily duplicative of information otherwise reasonably accessible to the agency; (c) Reduces to the extent practicable and appropriate the burden on persons who shall provide information to or for the agency, [and]…(j) To the maximum extent practicable, uses appropriate information technology to reduce burden."

400.   Plaintiff also suffered degrading treatment during this meeting, violating her universal human right. Dominium Management staff characterized Plaintiff's behavior as argumentative when in fact, Plaintiff was simply asserting her rights under federal law, and Dominium Management staff was violating them. It is of note that it is a lease violation to argue with leasing office staff; therefore, the argument statement is another instance of retaliation.

401.   HUD and Property Owner are culpable in the round-robin nature of seemingly shifting rules among different leasing offices for the same HUD-assisted multifamily complex. HUD designees ought not be allowed to make a blanket statement such as "we are not the previous leasing office." HUD-assisted residents do not need to be "kept on their toes", they need to feel relaxed in and about, and supported with respect to their homes. This shifting around in leasing office teams contributed to Plaintiff's chronic stress about her occupancy and overwhelming paperwork burden as it applies to her background check in 2018.

402.   The May 9, 2018 email contained the following statement: "Let me reiterate the importance of calling the office at your most earliest convenience to schedule the recert appointment to avoid the termination of the Project Based Section 8 Program for your apartment", and was based on and referring to an annual recertification letter with no OMB number or mentioning thereof.

403.   This email was sent less than 24 hours following Plaintiff's assertion of her rights to freedom from overwhelming paperwork burden. As such, this email constitutes another instance

of Dominium Management's retaliation toward Plaintiff by "…engaging, in bad faith, in a course of conduct that materially interferes with the tenant's rights under the tenant's lease (Texas Property Code § 92.331)." To wit, this was for annual recertification involving a lease possessing an expired rather than a current OMB number, as well as an annual recertification letter possessing no OMB number or reference thereto, thereby materially interfering with Plaintiff's right to not respond, through intimidation and harassment.

404.    Specifically, because these incidents involve requests for information involving no or invalid / expired OMB numbers, this statement also violates 5 CFR § 1320.6:

> "Public protection. (a) Notwithstanding any other provision of law, no person shall be subject to any penalty for failing to comply with a collection of information that is subject to the requirements of this part if: (1) The collection of information does not display, in accordance with § 1320.3(f) and § 1320.5(b)(1), a currently valid OMB control number assigned by the Director in accordance with the Act; or (2) The agency fails to inform the potential person who is to respond to the collection of information, in accordance with § 1320.5(b)(2), that such person is not required to respond to the collection of information unless it displays a currently valid OMB control number. (b) The protection provided by paragraph (a) of this section may be raised in the form of a complete defense, bar, or otherwise to the imposition of such penalty at any time during the agency administrative process in which such penalty may be imposed or in any judicial action applicable thereto. (c) Whenever an agency has imposed a collection of information as a means for proving or satisfying a condition for the receipt of a benefit or the avoidance of a penalty, and the collection of information does not display a currently valid OMB control number or inform the potential persons who are to respond to the collection of information, as prescribed in § 1320.5(b), the agency [or its designee] shall not treat a person's failure to comply, in and of itself, as grounds for withholding the benefit or imposing the penalty."

405.    To Plaintiff's knowledge, there is no other provision of law that circumvents Dominium Management's obligations under this regulation. To date, no dDefendant listed in this complaint has cited any such regulation that releases Dominium Management's obligation under this regulation.

406.    In writing this complaint, Plaintiff did discover a document addendum she was required to sign at initial occupancy of Lucero Apartments, entitled *Lease Contract Addendum for Units Participating in Government Regulated Affordable Housing Programs*, and labeled "TAA Official Statewide Form 09-V", from the Texas Apartment Association. This form states the following, in small print, in a legal-sized, lengthy document:

> "4. FUTURE REQUEST FOR INFORMATION. By signing this addendum, you agree that the annual income and other eligibility requirements for participation in this government regulated affordable housing program are substantial and material obligations under the Lease Contract. Within seven days after our request, you agree to comply with our requests for information regarding annual income and eligibility, including requests by the owner the appropriate government monitoring agency. These requests to you may be made to you now and any time during the Lease Contract term or renewal period. 5. INACCURATE INFORMATION AS GROUNDS FOR EVICTION. If you refuse to answer or if you do not provide accurate information in response to those requests, it will be considered a substantial violation of the Lease Contract and you can be evicted. It make no difference whether the inaccuracy of the information you furnished was intentional or unintentional."

407.    The Texas Apartment Association is a non-profit agency and not bequeathed with the power or authority to write legislative code. Furthermore, the "Official Statewide Form 09-V" is not discoverable as rule of law by way of an on-line Google search. Whereas some information on this lease addendum actually references legislative code and is helpful, Plaintiff avers this Lease Contract Addendum is overly burdensome in paperwork, as well as overly restrictive in some of its nonlegal statements, not to mention contradictory with OMB regulation.

408.    The TAA form does state it does not supersede federal or other law. However, that compels the tenant to search, as Plaintiff did, for other law, imposing a further paperwork burden with respect to the request for information. Also, it misrepresents TAA as a legal authority, and misrepresents statements made therein as legally binding statements.

409.   OMB is in part culpable for this problem. It is true that CFR § 1320 states that individuals receiving requests for information from government controlled corporations not including or mentioning an OMB number are not obliged to reply to said requests and cannot be penalized for refraining to respond. However, to Plaintiff's knowledge there is no legal mechanism preventing government controlled corporations from, or in place to punish said corporations for, issuing said requests. Therefore, Plaintiff avers that it may be necessary to add the OMB as a Defendant to this complaint.

410.   Further, OMB regulation ought to preclude third-party agencies from hitchhiking on OMB-regulated forms, thereby in practice increasing paperwork burden with respect to said forms.

411.   The onus of responsibility to comply with OMB regulation must be placed on the governmental designees with power over occupancy, and not on already burdened, stressed, impoverished, and therefore vulnerable residents. For this complaint, this failure culminates in lack of equal protection from eviction for Plaintiff and impoverished residents receiving HUD financial assistance in the realm of paperwork burden, as well as degrading treatment — compared with renters not receiving subsidies.

412.   Dominium Management's May 22, 2018 threatening letter is another instance of retaliation against Plaintiff for asserting her right to receive an annual recertification letter with a current and valid OMB number, as well as a violation of 5 CFR 1320, and in light of all the legal violations and corresponding emails and hard copy papers stuck in Plaintiff's door jamb, all centered around threatening Plaintiff's unit occupancy and Section 8 benefits or violating paperwork burden laws, constituted harassment.

413.   Dominium Management's utility allowance decrease agreement notice on or around May 25, 2018, with an expired OMB number on it, especially shortly after being told by Plaintiff several times both verbally and in writing about the OMB requirement, is another instance of retaliation against Plaintiff.

414.   The drawing out of annual recertification as well as provision of notice for it in the manner demonstrated in **Attachment 12**, with no notice about the office being closed and a request for a seven day turn-around for a behavior in which she did not even have to engage, during a week with a holiday in the middle, and after Plaintiff made clear she wished to not have to repeatedly go to the leasing office unnecessarily, is retaliatory on the part of Dominium Management.

415.   Plaintiff avers that pressured statements for performance and compliance involving wording like "immediately" and "as soon as possible" are both unreasonable and a violation of Plaintiff's universal right to freedom from degrading treatment, as well as her constitutional right to domestic tranquility — especially with no proffered deadline, and also at a time early in the annual recertification process.

416.   Plaintiff avers that the lack of an email address for Property Owner is unreasonable in this technological day and age, and erects obstacles to swift due process measures, including possession of a paper trail for Plaintiff.

417.   Plaintiff avers that the behavior of all leasing office staff in this complaint are in part the responsibility of Property Owner and their lack of providing an efficient electronic line of communication to them, for residents of Lucero Apartment Homes. It is also a violation of equal protection, erecting barriers for the presumed purpose of reducing communications Property Owner may feel are likely to involve unfounded complaints.

418.    The lease agreement terms are in many cases unreasonable and duplicative, and reflect a violation of Plaintiff's universal right by way of degrading treatment, as well as her federal right to freedom from overwhelming paperwork burden.

419.    These rights violations also apply to the lack of a provision of a system of written warnings and chances to come into compliance before a leasing violation is issued; a lack of a clear and reasonable plan for recording and notifying Plaintiff about lease violations, as well as a plan for clearing leasing violations after long-term compliance is established; the number of requested entries into Plaintiff's apartment; the last-minute nature of many apartment entry requests; and unreasonable cleanliness demands — including a lack of a succinct description from HUD of what will and will not be counted as leasing violations in the realm of inspections.

420.    The occurrence of too many entries and last-minute entry notices by Dominium Management, after having received written notice that frequent and unreasonably soon entries after notice is bad for health and therefore domestic tranquility and welfare, is retaliatory based on Texas Property Code.

421.    Failure to maintain common area planters, light fixtures, and elevators, and fix tenant's shower lining and unit number is a violation of her universal right to freedom from degrading treatment, especially in light of documentation requiring Plaintiff's and tenant's maintenance of their own plants on their balconies, as well as cleanliness of the interior of their home — not to mention the overly stringent criterion of seeking approval for any alteration.

## APARTMENT RENT CEILINGS ARE AT MARKET RATE

422.    Plaintiff avers that applying market rate to low-income housing is a misrepresentation of the property, given that it is not and cannot be on the market.

423.    Plaintiff avers that it is a violation of Plaintiff's and Lucero Apartment tenants' universal right to freedom from degrading treatment, and in kind a violation of their right to general welfare, to list high market values on a property that is poorly maintained, and where Plaintiff and tenants' rights are continually violated by HUD designees.

424.    Plaintiff avers this is a federal and Texas government code property error, in that property tax exemptions should be based on the activity / functions of the property itself, and not based on what type of business owns it.

## VIOLATION OF PLAINTIFF'S RIGHT TO FREEDOM OF MOVEMENT AND RETALIATION BASED ON HER RIGHTS ASSERTION

425.    Plaintiff avers that the provision of only two entry ways to Lucero Apartment Homes property, and the prevention of her regular use of two entries, is a violation of her constitutional right to freedom of movement. It is also a violation of her constitutional right to general welfare based on the fact that the location of these entry ways involves substantial exhaust exposure when traveling by foot, and which Plaintiff cannot escape — as well as her demonstrated inability to escape an aggressive and hostile situation due to the unnecessary and capricious physical constraints of the property.

426.    Plaintiff avers that the installation of an alarm on the east central emergency gate close in time after Plaintiff sent a letter requesting key FOB access to HUD, Dominium Management, Property Owner, and others, for residents' regular entry and exit, and having not installed an alarm before or after that time, was retaliatory towards Plaintiff on the part of Dominium Management and / or Property Owner.

427.    To reiterate, this retaliatory claim is based on the alarm installation occurring so closely in time after Plaintiff asserted her right to constitutional freedom of movement in writing

by way of being allowed regular entry and exit through the east gates. Property Owner and /or Dominium Management retaliated against Plaintiff's rights assertion by heightening security measures for the east gates, seemingly attempting to protect surrounding neighborhood residents only — from what exactly, it is not clear — yet not attempting to protect Lucero residents.

428.    Plaintiff finds that the barring of Lucero residents from using the east most emergency exits as just regular exits with key FOB access, degrading. This physical barrier makes Plaintiff feel like an unnecessarily caged animal. This is heightened by the fact that anybody can come in off the street and onto the premises through the two main, southernmost entryways, and many people can squeeze through the bars in most of the fencing. Thus, this is a violation of Plaintiff's universal human right.

429.    Plaintiff has experienced severe pain in the ball of her foot. Plaintiff attributes this pain to the fact that she has to walk everywhere as her mode of transportation on elongated metatarsals. With the current infrastructural and regulative arrangement for entry and exit points on Lucero Apartments property, it takes Plaintiff three minutes to exit the property, from the time she leaves her apartment. This is a violation of Plaintiff's right to both her freedom of movement and general welfare.

### A Final Concern Regarding Proposed HUD Regulation Changes

430.    The proposed bill entitled *Making Affordable Housing Work Act of 2018* requires HUD-assisted residents to be employed. This is a violation of HUD financially-assisted residents' universal right to freedom from degrading treatment.

431.    This proposed bill fails to take into account the fact that impoverished people are likely impoverished because they have had, and continue to have barriers to work or fiscal solvency by virtue of deprivation of their universal right to work, in some form or fashion — as

well as a historical lack of means of inheritance acquisition due to, for example, black families

not having the legal right to own land until relatively recently in the United States.

432.    The fact that almost all states in the nation are at-will employment states makes this

portion of the proposed bill not only unreasonable, but unconscionable.

433.    Plaintiff's lack of work is in large part a function of adverse and illegal action taken

by Eureka Management. In this light, that there is a bill now proposing to allow HUD-assisted

property owners / management to require work from its residents unless they are disabled or

elderly, is unconscionable salt on an unconscionable wound. This is just one way in which

barriers to employment for people living in government-assisted housing is manifest. Likely,

there are countless others.

434.    The portion of the bill suggesting an increase in rent is likewise unconscionable in an

era with the greatest economic disparity since the Great Depression, and especially in light of the

fact that properties are often given to and built for the property owners at substantially reduced

cost via a large number of corporate and government subsidy programs intended to benefit the

poor.

435.    Whereas a disability can circumvent a work requirement, it is beyond offensive to

consider Plaintiff must get diagnosed with a disability like anxiety, PTSD, or depression —

mental health problems directly caused by Lucero Apartments management — to obviate a work

requirement.

436.    If Lucero Apartments had upheld Plaintiff's constitutional and other rights, Plaintiff

would have been far and away much more likely to become fiscally solvent enough on her own

volition way before this abusive and undignified proposed legislation ever came into being.

437.    Probably a more relevant and effective piece of legislation than forcing poor people to work, would be to prevent people with jobs possessing both high status and salary (e.g., CEOs, professors, doctors, etc.) from making ten to twenty times the amount of people possessing low-status, low-salary, distasteful jobs (e.g., garbage collectors and janitors) — jobs upon which high-status, high-salaried people rely directly to perform their work, yet not vice-versa.

438.    Too, such a piece of legislation fails to consider the complex interplay among legislation from other departments. If the Department of Labor required impoverished people to be given priority status for hire, similar to what is currently in place in the realm of providing veterans preference for government jobs, then a job requirement may be unnecessary. Without this, the proposed legislation has the potential to violate Plaintiff's as well as other impoverished people's equal protection under the law.

439.    The requirement to submit hardship paperwork is just more burden for people attempting to live their lives and get back on their feet, constituting potential degrading paperwork burden for Plaintiff and other impoverished people.

440.    Finally, it is a lack of equal protection to require work from Plaintiff and other impoverished people receiving HUD financial assistance who have both a collective history of and current individual experience with discrimination, lack of equal pay for equal work, and lack of commensurately equitable pay for approximately equivalent work — the last of which is predominantly a problem for women, and all of which also African Americans.

441.    Specifically, to put a fine point on this last type of discriminatory income for approximately equivalent work by way of example, pre-K through 12 teachers are predominantly women, whereas tenured college professors are predominantly men. Despite the fact that the former has additional challenges such as the enhanced liability that working with minors who are

not self-sufficient brings, the latter are paid two to three times more in salary. Similarly, garbage collectors are predominantly men whereas household cleaners are predominantly women, and the former are paid twice as much on average as the latter.

## VI. HARMS INCURRED AND ACCRUING

### CRIMINAL TRESPASS CHARGE COURT-RELATED HARMS

442.    Overall, Plaintiff suffers from cruel treatment by federal agencies, due to her knowledge that appropriate and comprehensive legislative measures are not in place to protect the citizens of The United States of America from all the harms bestowed as mentioned in her complaint, and from the knowledge that the legislative protections asserted as necessary for justice by Plaintiff throughout this complaint are not currently in place.

443.    Because of the incessant torment of Plaintiff on Lucero Apartments property grounds and her resulting inability to focus, it has just become clear to Plaintiff as of July 4, 2018 in preparing this complaint, that perhaps expunction of her community supervision term is possible because it was commuted to a dismissal. Whereas Plaintiff possesses the capacity to write her own petition for expunction, Plaintiff believes it necessary to keep the file available as evidence during court proceedings for this current civil complaint.

444.    Plaintiff experienced all rights violations aforementioned in this complaint regarding court proceedings for her criminal trespass arrest, as degrading and harmful treatment. Plaintiff currently suffers a complete loss of faith in the criminal justice system, and somewhat in humanity as a whole, due to these harms.

445.    Plaintiff continues to suffer lack of freedom and liberty based on the actions of the Travis County Criminal Court, the Travis County District Attorney's Office, and Mr. Burke as facilitated and permitted by CAPDS.

446.    Plaintiff experienced lack of hire and believes she continues to experience fear of lack of hire due to the charge on her record.

447.    Plaintiff suffered and suffers fear of reprisal if she goes to The University of Texas at Austin campus or emails anybody there. Plaintiff experienced and continues to experience the inability to move forward with negotiations with The University of Texas at Austin to redress her civil rights complaint, and advocate for placement of a postdoctoral office commensurate with recommendations from The University of Texas System.

**EMPLOYMENT DURESS FOR PLAINTIFF CAUSED BY DEFENDANTS' COMBINED UNCONSTITUTIONAL ACTIONS IS ONGOING**

448.    Plaintiff's right to work was violated with respect to three different employers that are definitively known, due to Defendants' actions: a well-paying sporadic babysitting job, an entry-level job assisting with recovery of drug-addicted teens at a nearby residential treatment facility, and a leasing office job at Lucero Apartments.

449.    Plaintiff avers that, due to a probationary term on her record viewable both to the public on the Travis County website, as well as through background checks, there are other jobs for which she may not have been hired, but cannot know.

450.    Knowledge that the probationary term may bar Plaintiff's chances for some jobs has made and continues to make her tentative about going through the laborious and tedious process of submitting job applications for naught.

451.    Plaintiff has filled out and until writing this complaint continued to fill out laborious and tedious job applications, experiencing physiological feelings of conditioned aversion in the form of nausea from the process because she has done so many times with negative or no feedback.

452.    Having jobs illegally revoked from Plaintiff's employ, or illegally denied based on universal work rights violations and due process violations, has caused Plaintiff the torment of being required to continue the employment applications process.

453.    Eureka Multifamily staff would not allow Plaintiff to write checks for more than a year, instead requiring money orders for all financial transactions. Plaintiff finally inquired about why this was the case. Eureka Multifamily staff showed Plaintiff the probationary term as it showed up in their specialized on-line system for background checks. It indicated two separate lines for the case: one at the time of arrest, and for the time of probation. Therefore, it appeared to Eureka Multifamily staff that Plaintiff had two charges on her record, for one offense.

454.    The aforementioned caused, and continues to cause Plaintiff stress, wondering how many attempted business negotiations involving background checks have involved the misperception of two charges for the one (illegal) arrest (and related coerced probationary term), and whether this will be a new problem when a different management team takes up office at Lucero Apartments.

455.    Because of the intersecting nature of technological bureaucracy, Plaintiff does not even know where the onus of responsibility for this mistaken perception of two charges for one arrest, resides — with Travis County (it only lists one line for the charge), with background checking software, with some combination thereof (perhaps the background check software pulls both arrests and resolutions from Travis County or, does not clear arrest records history once a charge is resolved) or somewhere else.

456.    Plaintiff continues to suffer the loss of the money she could have earned, had she kept the babysitting job, or had been hired for either the Phoenix House or Lucero Apartments job.

457.    Plaintiff continues to suffer the loss of money for future jobs for which she is unsure whether she should spend the time to apply, given the obstacle of the probationary period into which Eureka's illegal act of making her occupancy contingent on the resolution of her open charge coerced Plaintiff.

458.    Plaintiff paid more rent than she should have based on Eureka Multifamily's decision to count her maximum number of hours worked at Vinaigrette Austin, instead of the minimum or mean number of hours for the predicted range of hours reported by the employer.

459.    Plaintiff is currently paying almost $50 a month for internet service in a facility outfitted for free fiber optic by way of 2015 legislation. Plaintiff has been paying for internet since she moved to Lucero Apartments. There is one low-cost option available, but it is in the form of a hotspot. Wireless technology lowers sperm counts, causes DNA breaks, and is more vulnerable to hacking. Also, the hotspot involves a one-time lump sum payment which is a relatively large financial investment for people living in poverty.

460.    Because Plaintiff's income as a Barista while working at Holy Cacao was temporary, Plaintiff suffered overwhelming paperwork burden and emotional distress from mistreatment by Eureka Multifamily. Plaintiff lost the money from paying rent she should not have paid from this temporary income.

461.    Plaintiff experienced severe emotional stress from the she lost the Barista job in June 2017, until she received a small surprise inheritance check in November 2017. Plaintiff can only characterize this time of her life as feeling as though she was seeing the world through a thick haze, with a dark cloud hanging over her — in Central Texas, during the dry summer and fall. Plaintiff went through the grueling process of applying for jobs during that time, suffering the emotional distress of not being hired for one job explicitly because of the probationary term

Eureka Multifamily caused. She was not hired for any jobs for which she applied during that time.

***Harms Incurred and Accruing for Plaintiff Based on Defendants' Failure to Provide Comprehensive Safety, Security, and Noise-Minimization Measures***

462.   Taken together, the persistent general welfare and domestic tranquility violations experienced by Plaintiff at Lucero Apartment Homes, including persistent mistreatment by property management, threatened assault, assault, terroristic threat, disorderly conduct, menacing behavior towards Plaintiff's property on the premises, constant and sometimes violent noise (roaring and screams that literally sound like bloody murder is being committed), unreasonable landscaping practices with no notice, the permitting of illegal fire safety inspection practices, and willful negligence of failing to intervene over the purposely tormenting noise from neighbor and others, caused Plaintiff multiple harms by way of chronic stress and chronic sleep deprivation.

463.   Chronic stress and chronic sleep deprivation have resulted in Plaintiff's cognitive deficits, including the inability to focus. These cognitive deficits have resulted in Plaintiff's inability to accomplish important, complex goals and tasks she has that, if met, would likely allow her the financial freedom to leave Lucero Apartments.

464.   Plaintiff has exceeded her time limit for some Defendants on a sex discrimination case for women in science and academia, and the clock is ticking — yet, due to Maslow's hierarchy of needs, Plaintiff felt the need to write the current complaint first, to protect her shelter, health, and wellbeing, so she may then write the lengthier and more challenging sex discrimination complaint. Plaintiff also avers this current complaint advocates for a more impactful and important cause.

465.    Chronic stress and chronic sleep deprivation have also contributed to Plaintiff's general and persistent lack of emotional wellness / sense of dread.

466.    Chronic stress suppressed Plaintiff's immune system, causing Plaintiff to be sick approximately 10 times in the first year and a half she lived at Lucero Apartment Homes. From approximately January - March 2018, Plaintiff was sick approximately seven additional times. In her life of almost 46 years, by her recollection Plaintiff has never been sick more than twice in a year, and often not even once a year prior to living at Lucero Apartments, despite rarely even getting an annual flu shot.

467.    Plaintiff avers that the chronic stress she has experienced has had a negative impact on her waning fertility, and has at times caused more frequent menstrual periods due to overwhelming work stress during Days 18-28 of her menstrual cycle — a time when extreme work stress and resulting cortisol levels are empirically shown to suppress progesterone in women, shortening the luteal phase of the menstrual cycle. So, more frequent periods. Yay.

468.    his stress is in part due to the fact that the only employment Plaintiff has been capable of reliably retaining is temporary work with Travis County Elections. Every time there is an election period (no pun intended), Plaintiff begins with a new team of elections workers, so it is essentially like starting a new job each time, which is stressful. Plaintiff avers this contributed to her being sick an additional seven times between January and March 2018.

469.    Chronic sleep deprivation due to noises late at night and early in the morning affected Plaintiff's ability to function well cognitively on complex tasks during the day, especially when more noise occurred throughout the day. This problem persisted from the time Plaintiff took up residence at Lucero Apartments, until the date when Plaintiff first complained to police about noise coming from the unit above her, in mid-to-late 2017. Still then, the noise would ramp back

up, hence multiple calls to the police, which were always temporarily effective for a period of time in reducing overall noise from the unit above her. Therefore, the magnitude of Plaintiff's chronic sleep deprivation decreased somewhat since around late 2017, yet it is still a regular — just a less frequent and therefore less severe — problem.

470.    Notably, Plaintiff began writing her sex discrimination complaint in October 2017, lending credence to her focus and cognition problems resulting from chronic sleep deprivation.

471.    Given the amount of downtime Plaintiff has experienced from being sick, menstruating more frequently than usual, being chronically sleep-deprived, and working jobs out of her chosen area of vocation and training, multiple jobs of which have involved 2-2.5 hour bus ride round trip, Plaintiff is shocked by how much she has been able to accomplish.

472.    Plaintiff still experiences a loud noise outside just before bedtime, and / or impact noise from the unit above her right before bedtime almost every night, the onset of which is seemingly timed precisely with when Plaintiff turns off her cell phone before going to bed. The impact noise is consistent, and every night.

473.    This noise starting right before bedtime occurs directly over Plaintiff's bedroom in the form of chair squeaks, loud and low frequency thuds, knocks, and taps that are audible with earplugs, sometimes until 1:34a (on July 1, audible through both ear plus and loud brown noise Plaintiff plays to mask noise). Plaintiff also currently experiences similar noises as early as 5:15a in the morning.

474.    The WHO report on community noise shows that uncontrollable noise right before bedtime is more adversely impactful than noise throughout the day because it increases the physiological fight-flight response right before the body is supposed to be engaging in the exact opposite type of response.

475.    Currently, as Plaintiff works on her complaint in the middle of the afternoon on July 5, 2018 while bordering on having a migraine, the tenant in the unit above her is stomping loudly right over her desk area, which is causing Plaintiff pain through her earplugs and masking brown noise played at its maximum. At this current point in time, Plaintiff is happy to add said tenant as a Defendant to this suit after it is filed.

476.    Plaintiff was and is afraid to store her bicycle outside on the bike racks on Lucero Apartments grounds for fear that it will be tampered with or stolen.

477.    Plaintiff was and remains currently afraid to buy an electric bike, scooter, or car for fear that it will just be stolen shortly after the purchase, a cost thereby unrecoverable based on claims restrictions induced in her renter's insurance as a function of the theft of her electric bicycle.

478.    High leasing office turnover increases paperwork burden and also the number of employees that will handle Plaintiff's most sensitive personal documentation. Given the illegal behavior of both management teams, Plaintiff feels a lack of security regarding her documents for identity, citizenship, and finances.

479.    Plaintiff felt a lack of security involving the keys to her apartment, and still feels a lack of security involving current and former maintenance access to her apartment keys.

480.    The persistent and unrelenting frequency of notices for entry from Lucero Apartments leasing staff, as well as short notice, together with unrelenting noise, is has caused and is continuing to cause chronic stress for Plaintiff.

### *Plaintiff Had and Has Persistent Fears of Eviction Due to Defendants' Criteria*

481.    Because of persistent failures of Eureka Multifamily staff to treat Plaintiff with calm and tranquil dignity and respect, as well as their law-breaking, Plaintiff has been worried about being evicted from her unit at Lucero Apartments since her move-in date.

482.    Plaintiff has rented many apartments as her domicile both long ago and recently, and has never been treated this poorly or had fears about being evicted, until residing at Lucero Apartments.

483.    At her first cheap apartment after leaving home for the first time at the age of 19 or 20, Plaintiff was treated like a pampered hotel guest by leasing staff. Now that Plaintiff is a mature, well-trained, accomplished, finely honed science machine, she is treated like a criminal or a POW-light, and tormented and abused.

484.    Every notice for inspection and recertification raises the specter of concern about retaining occupancy for Plaintiff, in largest part due to continual illegal behaviors by leasing office staff — yet also a great deal attributable to leasing requirements, which are difficult to absorb and retain given their voluminous, vague, overly restrictive, and contradictory nature, as well as their overwhelmingly unnecessary duplicativeness.

485.    For example, at sign-on residents receive three different statements about smoking on the property, with multiple addenda. Residents also receive a seven-page unstapled document about lead poisoning concerns within the home. Lucero Apartments was built within the last five years. Therefore, an addendum referencing lead poisoning in the home is unnecessary.

486.    If, how, and why exempt annual income is counted towards interim rent calculations is unclear. Vague and conflicting wording about reporting and counting employment leaves a chasm of ambiguity and potential for overwhelming paperwork burden for reporting temporary

income, and at the same time raising concerns about eviction if Plaintiff does not report temporary income due to misinterpretations by either herself or HUD designees.

487.    The lack of a clear plan for how leasing violations may be addressed, the overly physically restrictive nature of the property, as well as difficulty assessing what adverse actions lease violations may incur, has left Plaintiff in a state of constant vigilance. Residents are not informed how, if, or when they will be notified about leasing violations.

488.    HUD has a rule stating that minor leasing violations that do not threaten the harm of people or property cannot be used for eviction purposes, but that an overwhelming number of minor leasing violations, can. Lucero management has never made this clear to residents though, and Plaintiff had to stumble upon the statement when engaging in the paperwork burden of learning about other HUD requirements, rather than having Lucero Apartments providing clear, reasonable, and consistent terms with examples.

489.    In the past, Plaintiff has entered and exited through an east cameraed entrance that forbids throughway except in emergencies. In the past, Plaintiff has often used this entrance when somebody else had already left it propped open. Plaintiff is left to wonder whether Lucero staff has documented each one of her entries and exits as leasing violations, to be sprung upon Plaintiff at a later date, and months after she stopped passing through the entryway due to concerns about the capricious nature of the behavior of leasing office staff — even though she believes the restricted use of the entrance violates her constitutional right to freedom of movement..

490.    Based on Dominium Management's April 19, 2018 threat to evict Plaintiff if she called emergency personnel, Plaintiff is in fear of being evicted if she does so and has, by and large, refrained from doing so.

491.    Plaintiff currently suffers fears of eviction based on her report of harassment to the Austin Police Department based on Dominium Management's repeated threats of eviction and / or removal of Section 8 assistance for various reasons.

492.    Plaintiff continues to suffer from stress about her 2018 annual recertification, including from the rigamarole detailed in **Attachment 12**.

*__Plaintiff's Persistent Fears Concerning Homelessness Due to Defendants' Criteria and Her Inability to Pay Bills__*

493.    When signing on for occupancy in Lucero Apartments, Plaintiff did not have and still does not have a car.

494.    Plaintiff does have debt from the time leading up to her impending semi-homelessness, which occurred just prior to taking up occupancy at Lucero Apartments. The debt Plaintiff accrued was solely in the form of living expenses, including food, utilities, phone, and internet (Plaintiff has not had Cable TV on her own accord for approximately 15 years, saving having Basic for three months in 2011 because a roommate demanded it; Plaintiff is 45 years old and the majority of the bath towels she owns and uses are from when she was a minor living with her parents — i.e., she is not, nor has she ever been a big and frivolous spender).

495.    Prior to taking up residence at Lucero Apartments, Plaintiff made an arrangement with her debtor to close the credit card, take the interest rate down to approximately 0%, and pay $100 a month toward what was originally a balance of about $10,000.00.

496.    This debtor has made offers to Plaintiff several times to pay just a third of the debt in lump sum, and the debt would be settled. Plaintiff has not had this amount of money to pay. Therefore Plaintiff continues to pay the debtor $100 a month.

497.    Plaintiff is aware that if a bankruptcy judgment is made against her, it could not only completely ruin her credit, but also preclude her eligibility to future benefits, including, but not limited to, government-assisted housing.

498.    To Plaintiff's knowledge, HUD does not consider debt when making calculations toward rent for Section 8 housing. This has magnified Plaintiff's already dire financial situation. With all the cards at play with Lucero, Plaintiff regularly questions whether she will ever again be able to feel any semblance of residential, much less financial stability. It is an extreme burden Plaintiff continues to bear, and Plaintiff believes this $100 a month debt payment not being factored into her rent calculation has exacerbated her periodic fears of becoming homeless. Plaintiff also wonders how anybody experiencing extremely low income could have the freedom of movement afforded with a car in this our car-dependent society in the United states, and at the same time maintain occupancy in a subsidized unit.

499.    The lack of a lower limit for considering income for interim rent changes has left Plaintiff barely making it by — and this is with no car payment no gas payments, and no car insurance payment; no paid for full hair cuts, pedicures, or shoes (and shoes are basically Plaintiff's car) on her own in three years or more; and no new underwear (or towels, obviously) paid for by Plaintiff in six years (these are just a few examples).

500.    This is also *with* the benefit of Medical Access Program dental and health coverage for the indigent through Travis County, food stamps, sporadic receipt of free bus passes from Plaintiff's City of Austin social worker, and regular receipt of free food from the WIC Program at South Austin Neighborhood Center.

501.    In spite of all this, hovering at an AGI of approximately $3,000.00 a year on average, Plaintiff has been beyond stressed about being able to live in and retain her housing approximately four times a year while at Lucero Apartments, and sometimes for long periods.

**_Market Rate Claim Harms_**

502.    Plaintiff suffers psychological distress over the market rate amount for her apartment, where she is unrelentingly exposed to events and overstimulation that are empirically shown to cause Chronic Mild Stress, and where there is visible bulk and other trash strewn about as well as broken amenities and untended, dead landscaping throughout.

503.    This market rate amount provides the public perception that Plaintiff lives in glorious new housing in one of the most desirable neighborhoods in Austin, for which Plaintiff receives government assistance and therefore should be thankful. This has been repeatedly alluded to or overtly stated by members of Plaintiff's neighborhood community, as well as friends and family, which is degrading to Plaintiff.

**_Freedom of Movement Harms_**

504.    Plaintiff continues to experience lack of freedom of movement and association by way of the combination of her extreme poverty and lack of car.

505.    Plaintiff continues to experience violation of her freedom of movement by way of signage, rule, and fixture stipulating no movement through the east most gates of Lucero Apartments.

506.    This violation robs Plaintiff of her dignity, imposes harms by way of more vehicular exhaust while walking to key points of interest, and imposes additional travel burdens on Plaintiff.

507.    The additional time spent exiting and entering the complex is adding to her overall travel via walking, thereby contributing to Plaintiff's right foot pain, and posing further risk on the only mode of transport Plaintiff has left.

508.    The retaliation by Dominium Management against Plaintiff for asserting her right to her freedom of movement added to the chronic, severe, and pervasive psychosocial stress burden incurred by Plaintiff while living at Lucero Apartments, and in the context of the persistence of restriction of movement through the exits, this psychosocial stress is ongoing.

### *Proposed HUD Regulation Changes*

509.    The proposal for regulation changes from HUD to require some residents to work, rent increases, and paperwork burden for claiming hardship is causing Plaintiff additional psychological distress in a situation wherein Plaintiff has had substantial difficulty finding and retaining work and fiscal solvency due to the illegal actions of HUD designees.

### *Other Harms*

510.    Plaintiff's shower remains leaking.

511.    Plaintiff's unit number remains missing from the exterior wall of her unit.

512.    Plaintiff's extreme poverty and lack of freedom of movement has compromised, and continues to compromise her ability to garner employ, as well as socialize in a way that maximizes her likelihood of finding a man with whom she may meet her biological imperative of conception at her very advanced maternal age.

513.    Plaintiffs extreme advanced maternal age practically guarantees she will need to undergo expensive fertility treatments to conceive, if that is even still possible. Plaintiff's ongoing extreme poverty makes this an impossible dream, violating Article 25 the United

Nations' *Universal Declaration of Human Rights:* "Motherhood and childhood are entitled to special care and assistance."

514.   Due to theft of Plaintiff's electric bicycle, as well as her extreme poverty, Plaintiff's submitted renter's insurance claims have changed the terms of her policy so that she is no longer covered or coverable for theft. As such, Plaintiff is now afraid about the security of her belongings in her apartment, having no mechanism to recover losses incurred.

515.   Because of her extreme poverty, suffers time deprivations. Plaintiff is afraid to schedule most of her bills on automatic payment. Paying manually takes time. Time adds up when travel is by foot and bus, which takes a great deal longer than by car — sometimes more than quadruple the time; and when she must maintain her apartment in a clean condition with last-minute notices for entry. Plaintiff also regularly struggles with maintaining correct change for bus, rather than simply having a monthly bus pass for any trips she may need, which increases time costs. The barred use of the east most gates increases time costs for Plaintiff.

516.   Plaintiff suffers from limited access to free yoga due to limited travel and therefore inability to access free studios, access which in the past has nourished her physically, mentally, and emotionally in untold and amazing ways.

## VII. RELIEF SOUGHT BY PLAINTIFF

Plaintiff wrote this complaint pro se and is aware of barratry and other laws barring people from practicing in certain professions without a license, including but not limited to law. Plaintiff has also heard vague statements about the nature of writing legal complaints in reference to the rights of people other than the plaintiff themselves. As such, Plaintiff has made taken great lengths to attempt to talk about rights only as they directly affect Plaintiff.

However, Plaintiff strongly avers that the relief sought by Plaintiff ought to have a much broader impact in facilitating the constitutional and other rights of all people where applicable by way of legislative reform. Given that this is Plaintiff's first ever pro se complaint, Plaintiff respectfully requests that The Court show mercy in the face of Plaintiff's good will, help to guide and educate Plaintiff about the boundaries of what a pro se initial complaint may contain in reference to others who may benefit, and acknowledge that Plaintiff is seeking appointment of counsel to facilitate these ends.

## PRELIMINARY INJUNCTIVE RELIEF

### *Stay on Eviction and Subsidy Revocation Threats and Actions*

Plaintiff requests no further action by way of mention, threats, or actual action taken toward her to evict Plaintiff or revoke her Section 8 benefits by any and all entities involved with Lucero Apartments, including the current as well as any future leasing office management, while this complaint is open in court.

### *Installation of New Security Measures and Provision of Insurance Coverage*

Plaintiff seeks installation of all new deadbolts to her exterior doors, both entry and back patio, to be unwrapped in front of Plaintiff upon installation. Plaintiff seeks sole retention of all keys for all deadbolts, with any requests / requirements for entry to be made by appointment only with Plaintiff, with minimum seven business days advance notice.

Plaintiff seeks free installation of "Door Devil" doorway reinforcement kit by Lucero Apartments maintenance to defend her home against the common kick-in burglary attack.

Plaintiff seeks provision of equivalent comprehensive loss and theft coverage commensurate with what was provided through her renter's insurance policy prior to its downgrading to only fire and natural disaster coverage due to electric bicycle theft at Lucero Apartments.

### *Noise Reduction Measures*

Plaintiff seeks immediate installation of flooring underlayment with a rating of IIC-STC 70 for the entirety of the unit above Plaintiff's unit at Lucero Apartments. Plaintiff also seeks the immediate closing in of her bedroom to reduce sound travel therein. Not only will closing in the bedroom block noise coming in from the living room windows, the presence of more wall will distribute impact noise through a greater amount of material, thereby attenuating it significantly.

### *Shower Repair*

Plaintiff seeks to have her shower repaired in a substantial and permanent fashion that prevents leakage into the apartment below hers.

### *Change of Usage of East Central Fire Exit*

Plaintiff seeks removal of all signage directed at Lucero residents prohibiting their normal and regular movement through the east fire exit gates on Lucero Apartments property. Plaintiff seeks alteration of the fixtures for said gates to permit ease of entry from the exterior of the property, through the gates, allowing it to remain closed when not in use yet openable from the exterior of the property. Plaintiff avers the initial change does not require key FOB access until the entire property is securely fenced along the entire perimeter.

## MONETARY RELIEF SOUGHT

Pursuant to Texas Rule of Civil Procedure 47(c)(4), Plaintiff hereby states that she seeks monetary relief over $200,000.00 but not more than $1,000,000.00, subject to change based on counsel recommendation and Court determination.

The monetary relief sought involves (a) interim relief; (b) actual monies lost from unnecessary intrusions into Plaintiff's sporadic employment, resulting in her loss of job; (c)

actual monies lost due to inappropriate implementations of calculations in determining Plaintiff's rent, and (d) monies recoverable associated with landlord retaliation.

Plaintiff seeks projected monetary losses by way of failure to hire at Phoenix House due to the probationary term on Plaintiff's record, in the amount she would have earned from hire date to around the time of complaint submittal. Plaintiff seeks projected monetary losses by all responsible Defendants from whom monetary losses are recoverable, for Plaintiff's inability to work on and complete her complaint involving sex discrimination in science and academia, assuming she could have been able to work on the complaint and then garnered relief by way of a year's worth of working as a professor in her chosen field of specialty, if it weren't for the relentless torment, noise, fear of eviction / loss of subsidy, and chronic sleep deprivation Plaintiff experienced and experiences at Lucero Apartments. Each monetary loss, either actual or projected, is multiplied by five for damages in the realm of pain and suffering for the loss.

Plaintiff seeks counsel from The Court in whether to additionally seek separate monetary relief for pain and suffering incurred by the pervasive and unrelenting torment she endured during court proceedings for her criminal trespass charge, as well as her occupancy at Lucero Apartments to date, in addition to projected monetary losses related to employment. Plaintiff also asks that The Court consider application of attorney's fees for Plaintiff having written the the complaint, as well as any future attorney's fees incurred thereafter, either by Plaintiff or appointed counsel. Attorney's fees were not figured into the monetary level claimed by Plaintiff. Plaintiff has documented her hours worked on the complaint.

### *Interim Monetary Relief*

Due to Plaintiff's extreme poverty and employment duress directly related to this complaint, Plaintiff requests interim monetary relief as soon as possible to prevent Plaintiff from incurring

further losses, by way of a monthly payment to Plaintiff in the amount of $800 or more as The Court sees fit, in addition to subsidies already received by Plaintiff, until the case is resolved or until her sex discrimination in science and academia complaint is filed and interim monetary relief thereby commences. In the granting of interim monetary relief, Plaintiff seeks for this monetary relief to be in addition to any other monetary relief granted.

### *Monetary Relief Related to Court Proceedings of Plaintiff's Criminal Trespass Charge*

X.    Plaintiff seeks monetary relief from all parties from which or whom monetary relief is possible, in a manner that redresses the emotional distress, lost time, and lost money bestowed her as a function of the actions of all parties associated with contributing to Plaintiff's losses.

### *Monetary Relief for Retaliatory Incidents*

Plaintiff seeks monetary relief for ten instances of retaliation taken toward her by Lucero Apartments Property Management.

This complaint lists the retaliatory incidents of (1) Eureka Multifamily's having degraded her when she humbly sought help with interim recertification paperwork regarding a low-paying temporary Barista job for which she ought not have been required to complete paperwork in the first place; (2) Dominium Management's threat to revoke her Section 8 benefits if she exercised her right to summon police or emergency assistance; (3) Dominium Management's May 2 letter with threats of punishment for lack of response regarding a notification for information request lacking in an OMB number, and in response to Plaintiff's assertion of overwhelming paperwork burden; (4) Dominium Management's refusal to process Plaintiff's paperwork during an annual recertification meeting involving an annual recertification letter with no OMB number, as well as her explicit verbal assertion of overwhelming paperwork, yet with the history of threatened reprisal in the face of Plaintiff's failure to respond; (5) Dominium's May 8 retaliatory

characterization of Plaintiff's calm federal rights assertion as argumentative, wherein arguing with leasing office staff serves as the basis for a leasing violation, which when accumulated can resort in eviction; (6) Dominium Management's May 9 retaliation, on a Saturday, in threatening to punish Plaintiff by terminating her Section 8 program assistance regarding an information request via an annual recertification letter without any mention of an OMB number, and right after Plaintiff asserted her right to lack of overwhelming paperwork burden the previous day; (7) Dominium Management's May 22 urgent threat to revoke Plaintiff's Section 8 funding if she did not respond immediately to information requests involving an annual recertification letter containing no mention of an OMB number, after Plaintiff sent in writing a description of OMB regulation as well as supporting governmental legislative documents downloaded directly from the federal website, explicating her OMB-related freedom from reprisal therein; (8) Dominium Management's persistence of frequent entry notices and unreasonably timed requests thereof, after Plaintiff asserted in writing health concerns caused by this and therefore violation of her domestic tranquility and general welfare resulting from said notices; (9) Dominium Management's increase in security measures on the very gates Plaintiff claimed violated her constitutional right to freedom of movement, soon in time after Plaintiff made said assertion in writing; and finally, (10) the rigamarole denoted in **Attachment 12** after Plaintiff requested in writing that Dominium Management behave in a way that helps to minimize Plaintiff's visits to the leasing office involving paperwork.

Pursuant to Texas Property Code Tenant Remedies § 92.333, "...if a landlord retaliates against a tenant under this subchapter, the tenant may recover from the landlord a civil penalty of one month's rent plus $500, actual damages, court costs, and reasonable attorney's fees...If the tenant's rent payment to the landlord is subsidized in whole or in part by a governmental entity,

the civil penalty granted under this section shall reflect the fair market rent of the dwelling plus $500." Thus, Plaintiff seeks fair market value of her apartment plus $500 for each of the ten retaliatory events listed in this claim.

### *Other Monetary Relief Related to Lucero Apartments Harms*

Plaintiff seeks monetary relief from all relevant parties beyond retaliatory incidents and job losses, as The Court deems fit, proper, and just.

## INJUNCTIVE RELIEF

As mandated by the rules for the Western District of Texas, Plaintiff will compose a motion seeking the injunctive relief listed below with all evidence, after filing this her initial complaint, hereby seeking to be timely with the initial complaint. Plaintiff seeks rule of law or Judge preference for timeliness deadline for submitting her motions(s) for injunctive relief after filing of the initial complaint. Plaintiff also seeks rule of law or Judge preference surrounding the comprehensiveness of documentation provision. That is, seeks a determination from The Court about whether Plaintiff should provide lengthy government documents related to the complaint which are downloadable from the internet or on court record, such as OMB regulation, the HUD Manual, and Plaintiff's criminal trespass file on record with Travis County Court — or, does just communication evidence with Defendants suffice.

### *Relief Involving Plaintiff's Criminal Trespass Arrest Proceedings*

Plaintiff seeks from Travis County penalties imposed on all actors contributing to the violation of Fifth and Sixth Amendment rights, including Michael Burke, Travis County Assistant District Attorneys, and the Travis County Judges, as sanctioned by the American Bar Association.

Plaintiff seeks from the appropriate licensing board penalties applied to the evaluating psychologist responsible for evaluating her competency.

Plaintiff seeks from Travis County the immediate expunction of her Community Supervision dismissal, as long as said expunction will not interfere with Plaintiff's right and ability to seek relief from The University of Texas at Austin by way of her illegal arrest, assuming that the arrest record she holds will serve as sufficient evidence that the arrest occurred even after her charge is expunged.

Plaintiff seeks relief from The United States of America, by way of legislative reform imposing limitations on the parameters of court-ordered competency evaluations.

Plaintiff seeks from The United States of America, legislative reform wherein any timeliness restrictions for competency evaluation from time of order, is mandated to be extended based on health reasons, including but not limited to the occurrence of a defendant's menstrual cycle, wherein such legislative protections are not already available.

Plaintiff seeks from CAPDS a change in their name to reflect the nature of their function, i.e., public defense, rather than the private nature of the attorneys for whom they facilitate contracted appointment.

Plaintiff seeks from any relevant and authoritative party, which may be the Judge of The Court, a letter proclaiming Plaintiff's right to be and remain on the campus of The University of Texas at Austin to meet with faculty; attend seminars; enjoy library facilities; attempt to make appointments; and freely enjoy the premises and property in general. To be clear, Plaintiff is not asking for permission here to enter people's laboratories, core facilities, or classes unannounced or without permission, nor has Plaintiff ever done so. Plaintiff seeks for this letter to be given to Plaintiff, The University of Texas at Austin Legal Affairs, and The University of Texas Police Department.

Plaintiff seeks from any relevant and authoritative party, which may be the Judge of The Court, a letter mandating the removal of all blocks from any of Plaintiff's email addresses to or from any email address at The University of Texas at Austin or The University of Texas System, to be given to Plaintiff, The University of Texas at Austin Legal Affairs, The University of Texas Police Department, and the relevant information technology facilities at The University.

Plaintiff seeks from any relevant and authoritative party, which may be the Judge of The Court, a letter proclaiming that no legal authority at or representing The University of Texas at Austin or The University of Texas System, may coerce or intimidate any non-legal individual, be they faculty, Administrative and Professional personnel, staff, or otherwise, from freely interacting with Plaintiff. Plaintiff seeks for this letter to be given to Plaintiff, The University of Texas at Austin Legal Affairs, The University of Texas Police Department, and any and all non-legal staff that have been so intimidated and coerced in the past.

### Relief Sought via Changes in Texas and Federal Laws and Procedures Regarding Expunction

Plaintiff seeks relief such that all charges involving full serving of sentence and deferred adjudication terms, and dismissals, bring with them immediate expunction at the time of release / dismissal — except in the case of multiple violent felonies, wherein the most recent violent felony may not be expunged for a year, and with provisions for multiple extremely violent offenses held at a different tier with longer waits for expunction. Plaintiff seeks to have full felony records viewable by judges only, for the lifetime of the offender. Plaintiff seeks these legislative protections from the United States of America.

Plaintiff seeks relief such that any and all previous felonious offenders not be denied housing or public assistance, and instead be subject to reasonably peaceable increased monitoring.

*__Relief Sought via Changes in HUD Policy__*

__Background Checks__

Plaintiff seeks a clear, one-page statement from HUD regarding background check policies and written in plain English (or Spanish, as necessary) to be mandated that all applicants receive it upon their request for an initial application for HUD subsidized multifamily housing. This statement should include mention that open charges are not a basis affecting eligibility of occupancy, nor are any crimes for which a sentence or plea bargain with deferred adjudication term have been fully met, or charges conferring a dismissal, except in special cases wherein multiple violent felonies have occurred, and based on reasonable evidence there is cause to believe recidivism is likely. Because the likelihood of a person committing a violent crime decreases significantly with age, age will be considered a protective factor in violent crime recidivism risk.

Plaintiff seeks relief from the State of Texas by way of electronic practice and procedures and by way of federal legislative reform, in the manner of display of entries for all offenses. That is, in Texas and throughout the nation, each offense may only confer one entry, in that the arrest and then probationary term, do not appear as two separate events / documents, regardless of the source of information (i.e., government website, third party background check software, etc.).

Plaintiff seeks relief in the realm of background check governance. That is, where third parties produce background check information for HUD and other entities, Plaintiff seeks that individuals may choose the background check company HUD, employers, etc. use for their background check among a list of government-verified companies, allowing applicants to maintain a current and accurate background check profile via one background check company for all background checks, and obviating the need to address inaccuracies or inconsistencies

among different background check companies every time an individual submits an application for housing, credit, employment, etc..

**Relief from Paperwork Burden, Intrusiveness for Verification Purposes, and Law Perpetuating Financial Duress for Indigent Persons**

Plaintiff seeks relief by way of HUD to decrease the paperwork burden for annual recertification for both HUD designees administering HUD subsidies, and the residents receiving said subsidies. This is in part to decrease HUD designees' pressure related to paperwork burden, thereby preventing the displacement of their deadline stress onto residents, as well as freeing up desigees' time so they may comprehensively manage property maintenance and operations.

Plaintiff seeks relief by way of HUD mandate that a leasing office staff member be designated for multifamily property operations and maintenance management where most tenants are HUD financially assisted, who is prevented by law from having any involvement with certification or annual or interim recertification processes, so that there is a designated staff member with the time and ability to address all aspects of property maintenance and operations not directly related to HUD subsidies administration.

Plaintiff seeks alteration of HUD policy to require the provision of a one-page description of OMB requirements in plain English, including descriptions of paperwork burden law as it specifically pertains to HUD residents.

Plaintiff seeks alteration in HUD initial occupancy application and certification policy, wherein information sought for sporadic income and income not viewable electronically to the leasing office staff, is verifiable via written agreements / affidavits, emails, texts, checks received, and bank statement deposit patterns first and only, and barring leasing office contact with the employer.

Plaintiff seeks alteration in HUD policy so that there is an establishment of a "Basic Income Allowance". This Basic Income Allowance is not a sum to be paid to tenants in subsidized housing. Rather, it is a limit below which tenants should not be required to pay rent or engage in repeated interim recertification, or overly intrusive initial certification and annual recertification processes, thereby relieving Plaintiff and tenants of overwhelming paperwork burden.

Plaintiff seeks that the Basic Income Allowance established initially herein be set at $10,000.00 a year, or $833.33 a month. Plaintiff seeks that the Basic Income Allowance be then increased based on inflation similar to HUD's income limits, with the new amount corresponding to that percentage similarly provided to residents on an annual basis.

Plaintiff seeks alteration in HUD policy so that initial certification for occupancy requires no further intrusion into applicant's financial profile beyond the last four bank statements and regular employment, if an applicant's bank statements, liquid assets, indices of regular employment, and affidavit about sporadic employment do not exceed the Basic Income Allowance.

Plaintiff seeks alteration in HUD policy for annual recertification, wherein tenants are required to maintain a current annual AGI based on filing an annual tax return. If an occupant's AGI on their tax return for the previous year is less than $10,000.00, and tenant's bank statements from the previous four months do not indicate regular employment or an amount exceeding $10,000.00, then tenant's AGI, bank statements from the last four months, and liquid assets statements suffice for annual recertification paperwork, and for rent to be set at $0 for the following year.

Plaintiff seeks alteration in HUD policy for annual recertification to only permit designees' request of the last four bank statements for certification and annual recertification, and no more.

HUD current rule states information older than 120 days cannot be used for recertification, yet all HUD designees with whom Plaintiff has interacted to date at Lucero Apartments have required the last six consecutive bank statements for certification and annual recertification. Plaintiff has four bank accounts, so this would obviate the need to generate eight additional statements, some multiple pages in length.

Plaintiff seeks alteration in HUD policy for interim recertification to only permit interim recertification for regular employment for an amount exceeding Basic Income Allowance. Wherein a tenant newly acquires regular employment that exceeds the Basic Income Allowance amount, interim recertification will be required only after 1-3 months of newly regular employment have accrued. This would provide a basis for establishing actual monies earned, as well as ongoing rather than sporadic employment.

For such interim recertifications, Plaintiff seeks HUD regulatory reform for rent to be calculated based on a tiered system by income, such that 10% of income is taken for rent when income ranges between $10,000-$20,000, 20% of income is taken for rent when income ranges between $20,000-$30,000, 25% of income is taken for rent when income ranges between $30,000-$40,000, and 30% of income is taken for rent when income exceeds $40,000. Plaintiff seeks that these income tiers change hereafter as a function of inflation, or, vary based on cost of living indices.

Plaintiff seeks HUD regulatory reform, wherein tenants' debts are reasonably factored into rent payments, with a demand that all debt accruals aside from car loans (e.g., credit cards) be closed and no future debt is taken on by the tenant until tenants no longer possess the existing debt and are regularly earning a certain amount of income (preferably, $30,000 or more as a starting suggestion), and / or have a minimum amount in savings (e.g, $20,000).

Plaintiff seeks HUD regulatory reform requiring provision of a document equivalent to the current Appendix 7 with the changes mentioned above, to all applicants upon their request of an initial application for HUD subsidized multifamily housing.

Plaintiff seeks HUD regulation requiring provision of documentation by a centralized HUD agency via email to applicant, with a designated email hotline for any and all applicants or subsidy recipients to communicate designees' violations of all policies.

Plaintiff seeks a system of a warning to a HUD designee for violation of said policy, or failure to provide said policy to Plaintiff, with an opportunity to come into compliance. Wherein no compliance is achieved or multiple violations of the same type are enacted by a given designee, the individual designee will receive a personal financial penalty in the amount of $500, or preferably some percentage of their monthly income for one month. Where any loss or harm is incurred by applicant / tenant based on action of an individual designee, HUD will seek to rectify said loss or harm for applicant / tenant.

Plaintiff seeks relief from paperwork burden for both HUD-assisted tenants and HUD designees for administering financial programs. As examples, wherein a "Fact Sheet" or a "Model Lease" do not differ at all between funding programs (i.e., Section 8 vs. another HUD subsidy program) or only differ slightly based on population served (i.e., disabled vs. elderly), HUD will consolidate the Fact Sheet and Model Lease into one document each, and then provide an addendum listing special provisions based on funding program or population served — rather than repeating the same document in its entirety with one, a few, or even no differences based on the different category. If they wish to provide unique copies for designees' print-outs and usage, then make downloads available to them rather than incorporating the entire document repeatedly

in the *HUD Handbook 4350.3: Occupancy Requirements of Subsidized Multifamily Housing Programs Rev. 4.*

Plaintiff seeks HUD policy regulation changes so that designees administering HUD subsidies must be available to politely and effectively communicate with and inform tenants about rent and other subsidy calculations, both beginning at the start of the initial certification process, and at any time thereafter — i.e., both before and after certification and recertification processes.

**Relief Sought for Unreasonable Time Constraints in HUD Financial Assistance Processes**

Plaintiff seeks relief for applicants seeking occupancy in HUD subsidized multifamily housing, wherein HUD requires HUD designees to provide applicants a month-long period for sign-on, with an additional two weeks at request of hardship.

Plaintiff seeks relief for subsidized residents by way of HUD legislating reasonable scheduling for tenants, in that tenants are provided one month's worth of notice for the first notice of annual recertification prior to establishing a meeting time. Plaintiff seeks relief for second and third notices for annual recertification in that two weeks advance notice are provided for each of these requests

Plaintiff seeks relief for HUD designees administering subsidies in multifamily by way of HUD legislating reasonable scheduling for annual recertification. Plaintiff seeks that annual recertification be administered in two batches across the year and, based on the size of multifamily housing, the number of designees required to be employed for administering subsidies at a given property be established on a per capita basis.

*Relief Sought for Lack of Tranquility at Lucero Apartment Homes via HUD Regulation*

Given the doubling of the U.S. population every 25 years, it is the obligation of appropriate federal departments of the United States government to legislate proper multifamily infrastructure specifications that will ensure the domestic tranquility, general welfare, due process, and equal protection for the increasing numbers of U.S. citizens residing in multifamily housing — both for protecting citizens and the environment.

Plaintiff seeks relief from lack of domestic tranquility, general welfare, and due process at Lucero Apartments from Property Owner by way of the following measures, and seeks relief for all multifamily residents in kind by way of HUD legislative reform. Plaintiff seeks from Lucero Apartments Property Owner, installation of a fully fenced perimeter with aesthetically pleasing fencing, 6-8' in height and with bar widths that do not permit small children to escape. Plaintiff seeks installation of a gate guard station with electronic gates at the Durwood Street entrance. This measure would obviate the need for changing laws and procedures about exterior locks.

Plaintiff seeks same relief by the same parties way of a hired gate guard to be on the premises for 24 hours or, wherein full fencing and gating may obviate such a need, use of closed circuit cameras to monitor entries for the purpose of enforcing disruptive behavior. Although, current cameras on the property are purportedly not used for security purposes, and cameras cannot enforce regulation the way a person can.

Plaintiff seeks same relief from same parties by way of a hired on-foot 24-hour security guard, with provisions of a guard room for sleeping after midnight, yet a phone that can be readily called by any resident in the event of a safety, security, non-emergency fire alarm, or lock-out problem. Plaintiff seeks possibility increasing the number of security guards per capita on multifamily premises, to be more substantial and comprehensive for subsidized multifamily

premises and those harboring populations with special needs, by way of legislative reform in the event some properties are more problematic than others.

Plaintiff seeks the placement of at least one 24-hour security officer of the peace with psychological training, whose job is to manage potential conflicts in a manner that serves the needs of all people on the property, with clear plans of action and enforcement for problems that minimize harm and maximize occupancy retention for all residents — including those initiating conflict.

Plaintiff seeks relief by way of HUD legislative reform for all bike racks to be secured, not unscrewable from the base, and cameraed.

Plaintiff seeks relief by way of HUD legislative reform that camera security measures at all multifamily properties by closed-circuit, and mandated as required use only for security and safety of tenants and guests on the property.

Plaintiff seeks HUD legislative reform that takes into account integration of multifamily properties during the site planning and approval process, and especially those considered low-income, into the surrounding neighborhood, with the goal of minimizing noise, minimizing costs, minimizing exhaust exposure to residents, and maximizing safe accessibility to nearby amenities such as municipal parks, libraries, grocery stores, and schools for residents of the property — and not just surrounding neighbors.

Plaintiff seeks counsel in the most efficacious and cost-effective way to address the existing noise problem as it relates to the infrastructural juxtaposition of the Splash Pad area at Lucero Apartments.

Plaintiff seeks installation of an armed cross walk and / or stoplight at the intersection of Oltorf and Durwood Streets from the City of Austin.

Plaintiff seeks the installation of (IIC-STC) 70 rating for flooring underlayment in all new multifamily properties, as well as installation of said flooring above and / or in units in existing properties upon request from tenants wherein tenant complains of impact noise.

Plaintiff is unaware of the financial profile of Property Owner. Wherein costs for infrastructural changes are prohibitive, Plaintiff seeks immediate relief from Travis County in the way of completely exempting Lucero Apartments from property taxes for at least one year, meanwhile allowing Lucero Apartments to continue charging rent at the current rate, to defray infrastructural costs for that year. For the the 2017 year, Lucero Apartments paid $332,097.75 in property taxes.

**Plaintiff Seeks Relief From Constant Intrusions and Maintenance Noise**

Plaintiff seeks HUD legislative reform to require a minimal use of grass in landscaping, to reduce the use of lawnmowers, leaf blowers, and weed-whackers.

Plaintiff seeks instantiation of HUD policy to require all unit-intrusive maintenance and inspections, as well as noise-related maintenance be held quarterly, maximum, within the same week, for multifamily properties. These include yet are not limited to mowing, leaf-blowing, pressure washing, air filter changes, pest control entries, fire safety maintenance, any complex-wide need to put stickers on things, and inspections.

Wherein mowing and blowing are required to maintain the health and aesthetic appearance of grass, Plaintiff seeks requirement of HUD policy that the quietest machines available on the market be used, and with the least exhaust possible; and provision of a regular schedule that confers the least frequent maintenance possible, with the schedule as regularly periodic as possible and communicated way in advance to residents.

Plaintiff seeks HUD legislative reform and Lucero Apartments action in abating the illegally noisy fire safety inspection regime, as well as yearly smoke alarm low battery beeps. No fire alarm inspection should involve two days of multi-hour-long bouts of engaging loud fire alarms either on the general premises or inside units. Smoke alarms should be mandated to have put in them only new backup batteries, and only with a warrantied 10-year lifespan, such as the ULTRA LIFE, 10 year smoke alarm battery, U9VL-X.

### *Injunctive Relief Sought for Utilities Mismanagement*

Plaintiff seeks HUD legislative reform in mandating a consistent and fair administration of utility allowances, with no proposals for decrease unless there is a significant change in implementation such that a utility allowance is no longer necessary. Plaintiff seeks same reform from HUD in allowing internet and partial phone costs to be covered by utility allowances in the event free internet services are not available to a subsidized multifamily property.

Plaintiff seeks proactive procurement of multiple affordable fiber optic services by Lucero Apartments Property Owner and leasing office staff, with updates to tenants regarding progress.

Google Fiber is in part culpable in its communications with Plaintiff regarding internet provision, and Plaintiff seeks relief from Google Fiber in reasonable fiber optic provision to low-income residents in an urban area with a building already outfitted for fiber optic. Plaintiff avers Google Fiber is obliged to service Lucero Apartments with fiber optic and provide at minimum a $25 / mo fast-speed internet tier to tenants, with minimum 50 Mbps down for said tier.

Plaintiff seeks relief from HUD in updating requirements for competitive and affordable fiber optic provision to new low-income housing already infrastructurally outfitted for fiber optic by virtue of its 2015 infrastructural initiative.

Plaintiff seeks relief from HUD legislative reform in the realm of seamless transition across management companies in administering HUD subsidies to multifamily properties, including, but not limited to the manner in which metered water is managed.

It took two years before Plaintiff found programs for low-cost computers for low-income households. Plaintiff is still unsure whether she is comprehensively knowledgable about the companies that provide internet in her unit. Plaintiff seeks HUD legislative reform that requires leasing offices to provide tenants with information for available utilities and low-income programs that can positively affect residents, both at sign-on and yearly upon annual recertification.

### *Injunctive Relief Sought for Trash and Recycling*

Plaintiff seeks relief from the City of Austin for Austin multifamily properties in the realm of comprehensive provision of Austin Resource Recovery services, including trash, recycling, and bulk pick-up.

Plaintiff also seeks relief from the City of Austin for strict, progressive compliance implementation of recycling in multifamily housing. Some cities manage the problem of low recycling by refusing to pick up trash or recycling that is clearly a mix of recyclable materials and trash, until it is resorted. Plaintiff seeks the progressive implementation of a plain wherein trash and recycling for multifamily properties are portered by sector for one year, followed by the implementation of refusal to take said trash at remaining (non-multifamily) properties. Where feasible and enforceable, Plaintiff requests on-site maintenance at multifamily properties be included in part to help in this effort.

Plaintiff seeks relief from the City of Austin in providing consistent, prominent, and aesthetically pleasing signage and coloration, including signage in Spanish where necessary, for

multifamily properties in the administration of enforcement for compliance with appropriate trash and recycling disposal.

Plaintiff seeks relief from Lucero Apartments Property Owner by way of installation of more aesthetically appealing trash cans at the entry ways of the property.

Plaintiff seeks relief from Lucero Apartments maintenance by way of replacing the trash can next to the mailboxes with a recycle bin, with the contents of the recycle bin actually recycled.

Plaintiff seeks relief from the Environmental Protection Agency in instantiating federal code of regulation for nationwide recycling — from disposal to recovery.

### *Injunctive Relief Sought for Other Harassing, Illegal, and Degrading Treatment by HUD Designees*

Plaintiff doesn't even know what to say about elevator problems, because it seems to Plaintiff prima facie obvious that it is the obligation of Lucero Apartments Property Owner and management to ensure the safety and prompt repair of the elevators on the property. Perhaps the requirement of a third staff member not permitted to handle overwhelming certification and recertification paperwork may provide the people power necessary to address problems such as illegally loud elevator dings from within the elevator with the doors closed, and broken elevators.

Plaintiff seeks relief in the the way of HUD legislative reform in that measures be taken to move tenants create unrelenting noise to different units, before moving in a new tenant in from the waiting list, rather than only considering disability accommodation and family size as reasonable provisions for moving. This is particularly important in light of the increased vulnerability of HUD-assisted multifamily property tenants to community noise as avered in the Legal Arguments section of this complaint.

Plaintiff seeks from HUD legislative reform, a mechanism wherein tenants of multifamily housing can create an on-line, ongoing report for tenants involving repeated violations of their domestic tranquility and / or safety by the same offenders on the premises, with mandated procedures for HUD designees to address the problem with the repeat offenders.

Plaintiff seeks from HUD legislative reform, that HUD designees administering subsidies in multifamily housing must communicate with residents on-line when the office is closed during normal business hours.

Plaintiff seeks relief by way of HUD legislative reform a comprehensive plan with reasonable timelines for warning tenants of HUD-assisted multifamily properties of a lease violation, communication of specific ways in which tenant may come into compliance with the lease, a period of time for tenant to demonstrate compliance, and, wherein the tenant fails to comply, recording and notice of a lease violation. Plaintiff seeks for this legislative reform, an on-line system for lease violations where tenants may view their lease violation history. Plaintiff also seeks reasonable rules for clearance of lease violations once tenant has demonstrated enduring compliance with a given regulation.

Plaintiff seeks relief by way of HUD legislative reform to specifically regulate, and reduce or eliminate property maintenance costs for tenants of subsidized housing, thereby circumventing any attempts of HUD designees to, e.g., charge $100 for moving a couch to a dumpster, or pay for Splash Pad water at a Splash Pad a tenant does not use. Plaintiff seeks that these regulations be explained in a one-page document to occupants, provided during the initial sign-on process.

Plaintiff seeks relief by way of HUD legislative reform for reducing paperwork burden by truncating the no smoking addendum to one page, or removing any related addenda because it is already mentioned in the Community Policies, and preventing the provision of unnecessary

documents such as the lead addendum by eliminating it from the sign-on package for new properties (or, truncating it to one page, describing how the property itself is old and as such the dirt on the property may contain lead, in lieu of the 8-page lead addenda referring to lead paint inside the home).

Plaintiff seeks relief from overwhelming paperwork burden in practice by way of HUD legislative reform for leasing sign-on paperwork. Specifically, Plaintiff possesses three lengthy documents: the *Resident Selection Plan Layered Section 8 / LIHTC, The Model Lease for Subsidized Programs, and* The *Lucero Apartment Homes — Community Policies* document. Plaintiff seeks separation of pre-occupancy and occupancy information relevant to tenants for the *Resident Selection Plan Layered Section 8 / LIHTC* document for ease of understanding. Plaintiff seeks that the *Model Lease for Subsidized Programs* not be suggestive but rather morphed into a *Required Lease for Subsidized Programs.* Plaintiff seeks HUD consolidation and completion of the *Required Lease for Subsidized Programs* that is comprehensive and reasonable, and involves terms set in *Lucero Apartment Homes — Community Policies* document that ought not change based property or by state (e.g., inspections rules, maintenance rules, rent payment dates, late charges, notice to vacate, housekeeping, noise, weapons, prohibited conduct, subletting, windows / balconies rules, apartment transfers, alterations, landscape and grounds, parking areas, water furniture, complaints, guest stays, resident insurance, utilities maintained, and banning blockade of entrances).

Plaintiff seeks from HUD a legislative requirement that those issues addressed in the *Required Lease for Subsidized Programs* not be duplicatively addressed in further lease addenda or lease documents for subsidized program recipients. Plaintiff seeks HUD's assertion to designees administering subsidized programs that they must (1) minimize the number of addenda

to the lease to the maximum extent possible, not to exceed five; (2) minimize the length of the addenda to no more than one letter-sized page in 11-pt font; (3) not duplicate addenda for issues already addressed in the *Required Lease for Subsidized Programs;* and (4) provide no addenda that, in any subpart conflicts with federal regulation or rules in the *Required Lease for Subsidized Programs,* and wherein a subpart does conflict, a line is drawn through the subpart with a stamp bearing the property name in the margin.

Some unreasonable components of existing documentation include: tenants are not permitted to "loiter" on the premises; tenants are held responsible for illegal activity of guests in the immediate vicinity of, but which is not committed on the actual premises of Lucero Apartments; the requirement that tenants report emergency calls to the leasing office (overwhelming paperwork burden in the face of their own violation of domestic tranquility by virtue of inadequate security measures); and the blanket requirement that tenants seek approval for *any* alteration to the apartment. These are a lack of equal protection. If Plaintiff owned her home or rented an unsubsidized apartment, she would have right to enjoy the premises. If Plaintiff's guest drank from their own alcoholic beverage container in their car on the street in front of her owned house or unsubsidized apartment, the police would not hold tenant accountable.

If security was adequate at Lucero Apartments, tenants would not need to report emergency calls to the leasing office because they would alert security instead, who would document said calls to the leasing office. Security would also be available to observe illegal activity by guests in the vicinity of the property. In unsubsidized rental apartments, the provision of 1/8" or smaller holes for decorating the unit is a typically allowable standard for a lease, without seeking landlord approval. Further, tenants ought to be allowed to paint in a light or medium color.

Plaintiff seeks relief from HUD legislative reform by way of provision of an updated refrigerator magnet list for all important numbers including 24-hour security, after hours maintenance, 311, utility companies, code enforcement, leasing office, and leasing office hours.

Plaintiff seeks relief by way of HUD legislative reform to reduce paperwork burden by providing leasing documentation to residents via email or an on-line portal in an accessible way, with all documents text-searchable and therefore not images or pdfed images of the original document. Wherein a tenant requests a hard copy of the lease and addenda, Plaintiff seeks relief from paperwork burden for tenants by way of a notebook with multiple tabs for different categories of paperwork.

Plaintiff seeks relief from OMB that wherein there is no rule barring violation of or enforcing OMB requirements, OMB comprehensively develops such legislative reform. If it is the case that no provision is currently available for truncating documentation in the realm of overwhelming paperwork burden for receipt of documentation such as leases or other contracts and their addenda, be they provided via a governmental body or corporation, such a rule is comprehensively developed, instantiated, enforceable, and enforced.

Plaintiff feels a lack of security by way of Eureka Multifamily's and Dominium Management's behavior of placing all documentation in Plaintiff's door jamb, including important notices such as those for annual recertification. Comprehensively fencing the property will allay this concern to a degree, however, Plaintiff has experienced a lack of safety from people she believes are tenants of Lucero Apartments. Other tenants have expressed similar concerns to Plaintiff. As such, Plaintiff seeks HUD legislative reform that requires and ensures that all notices be sent to tenants receiving subsidies via email.

Plaintiff seeks relief for elderly tenants not familiar with computing, such that they may receive all documentation via postal mail upon request. Plaintiff seeks that HUD determine by valid and reliable information the proportion of adult heads of household by age that are not yet proficient with email and set a cut-off year for implementing on-line documentation provision, with exceptions for extreme financial hardship and related lack of regular computer access. Because some of these are sensitive documents, Plaintiff seeks required response of receipt from recipients. Here, Plaintiff avers it may be best to create a HUD documents portal for communications between IHUD designees and tenants, wherein tenants can verify they received notices, and also, wherein they may submit maintenance requests and complaints with open-ended area for additional comments, and with similarly required verification of receipt by HUD designees.

Plaintiff seeks relief from Property Owner to provide an email address where tenants can submit complaints about contracted HUD designees. Plaintiff likewise seeks relief from HUD in that it makes this provision a requirement for all subsidized multifamily housing.

### *Tax Exemptions for Multifamily Properties Receiving HUD Subsidies for its Residents*

X.  Plaintiff seeks relief from The State of Texas by way of amending Property Tax Code and and Texas Department of Housing and Community Affairs code to allow properties primarily serving the function of low-income housing, to receive property tax exemptions, irrespective of the type of corporation that owns the property.

X.  Plaintiff seeks relief from HUD to work with the appropriate federal agency governing property tax exemptions for housing charitable organizations, to amend said federal code in kind.

X.  Plaintiff seeks that property owners not possessing non-profit status that own low-income housing property should be mandated to have a cap on the profit earned from the low-income

property (e.g., at 17%), to be applied to all aforementioned requests for legislative reform referred to in this section.

X. Plaintiff is ignorant about current exemption rates and, in this light seeks that non-profit exemptions for both the federal and state requirements be set at at least 50% for counties with larger populations, which thereby have the ability to absorb such costs.

X. Plaintiff seeks from HUD a mechanism whereby a similar exemption may be applied in the realm of Section 8 vouchers, to provide incentive to individuals renting out garage apartments, single units, or a small subset of units to house low-income residents.

X. Plaintiff is aware that Lucero Apartments already receives federal subsidies, and that in the past, legal arguments have been made that federal subsidies defray the costs enough to avoid putting additional burdens on local taxpayers via property tax exemptions.

X. Plaintiff avers that, in light of the vulnerable status of low-income residents previously illustrated in this complaint, federal subsidies need to be modified where necessary to make way for their use in comprehensively maintaining and operating low-income housing in a manner that fully supports and protects these vulnerable residents.

### *Relief Sought in the Realm of Freedom of Movement*

Plaintiff and tenant use of the east most gates on Lucero Apartments property that are currently allowed for emergency exit only, would provide a more exhaust-free and car-free route by foot, wheelchair, or bicycle to the less exhaust-filled #1 and #10 bus routes, as well as another frequently used bus stop (formerly #331, recently changed to #300), nearby public schools, and the grocery store three blocks away.

Plaintiff seeks permanent injunctive relief from HUD in the realm legislative reform for multifamily building code by way of mandating comprehensive gated communities with key

FOB access, with multiple ADA-accessible entry and exit points. Plaintiff seeks relief from Property Owner by way of allowing entry and exit of the east most gates that are now emergency only, by way using resident's existing key FOBs.

Plaintiff seeks permanent injunctive relief by Property owner for secure regular use of east most gates by residents only using their existing key FOB already in residents' possession for the (currently inoperable) accessing of the Community Center and Exercise Room. Plaintiff seeks a permanent stay for disengagement of the audible alarm installed on said gate.

Plaintiff seeks relief from Property Owner and the City of Austin by way of making the two east most gates on Lucero Apartments property ADA-complaint, by cutting out the curb from the city sidewalk to the street. If we can have curb cutouts for driveways in the middle of streets, surely we can have curb cutouts for ADA-compliant sidewalks.

### *Relief Sought Regarding the Proposed Affordable Housing Act of 2018*

Plaintiff seeks a stay on the enactment of the *Making Affordable Housing Work Act of 2018* bill until it is comprehensive and includes the relief sought from HUD heretofor in this complaint.

Plaintiff seeks HUD's removal of the work requirement in the bill. Plaintiff seeks HUD's working with the Department of Labor to put in place priority requirements for people who are low-income, for all employment applications. Plaintiff seeks HUD's removal of the rent increase from the bill. Plaintiff seeks the burden of applying for hardship, removed from the proposed bill. Plaintiff seeks HUD's work with the Department of Labor to legislatively abolish the types of income inequity mentioned in the legal argument relating to this bill.

*__Permanent Solution for Possibility of Future Retaliation Toward Plaintiff__*

Plaintiff seeks counsel and Judge recommendation for ways to prevent any Defendant from singling out, helicoptering, micromanaging, and / or disproportionately penalizing Plaintiff's behavior compared with other residents of the Lucero Apartments property, both after the filing of this complaint, and any time after the claim is resolved, with a discriminating eye on even actions that could be perceived as retaliatory (i.e., Plaintiff requests a wide berth, given that she is an upstanding citizen, is advocating for people's rights, is not addicted to alcohol and uses no illicit substances, is old, goes to sleep relatively early every night, and is generally a reasonable person).

In this light Plaintiff requests warnings for only reasonable problems and specific statements for reasonable compliance measures prior to any adverse action taken against Plaintiff, that are in kind applied to all residents in equivalent fashion based on violation type and severity.

## VIII. RESPECTFUL REQUEST FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully requests that the Court provide Plaintiff's relief as it is sought in its entirety, and for such other relief as the court deems just, appropriate, and equitable.

I declare under penalty of perjury that the foregoing is true and correct.

Signature of Plaintiff
Rebecca H. Gallogly
2301 Durwood Street, Suite 3408
Austin, TX 78704
512-663-4396

July 9, 2018
Date

136 of 140